J-A04035-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.L., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: R.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 914 MDA 2017 |

Appeal from the Decree Entered May 9, 2017
In the Court of Common Pleas of York County Orphans' Court at No(s):
2017-21

| | | |
|---|---|---|
| IN THE INTEREST OF: O.L.R., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: R.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 915 MDA 2017 |

Appeal from the Decree Entered May 9, 2017
In the Court of Common Pleas of York County Orphans' Court at No(s):
2017-18

BEFORE:   STABILE, J., NICHOLS, J., and RANSOM*, J.

MEMORANDUM BY RANSOM, J.:                    **FILED MARCH 13, 2018**

R.L. ("Mother"), appeals from the decrees dated and entered on May 9, 2017, granting the petitions filed by the York County Children and Youth Services ("CYS" or the "Agency"), to involuntarily terminate her parental rights to her children, O.L.R., born in September of 2012; and C.L., born in

_____

* Retired Senior Judge assigned to the Superior Court.

September of 2013 (collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).[1]  We affirm.

The trial court has set forth the relevant factual and procedural history of this case in its adjudication and termination orders of May 9, 2017, which we adopt for purposes of this appeal as well as further appellate review. *See* *In Re Adoption of O.L.R., A Minor*, Adjudication and Termination Order, 5/9/2017, at 1-35; *In Re Adoption of C.L., A Minor*, Adjudication and Termination Order, 5/9/2017, at 1-36.  Significantly, on January 20, 2015, the Agency filed an application for emergency protective custody of the Children following Mother's suicide attempt and departure from the hospital against medical advice, admitted use of drugs, and several mental health diagnoses.  Over the next two years, Mother was unable to resolve the unsuitable nature of her home or satisfactorily address her mental health.

On January 25, 2017, the Agency filed petitions to involuntarily terminate Mother's parental rights to the Children and to change their permanency goal to adoption.  The trial court held evidentiary hearings on

---

[1] O.L.R and C.L. have different fathers.  *See* *In Re Adoption of O.L.R., A Minor*, Adjudication and Termination Order, 5/9/2017, at 2; *In Re Adoption of C.L., A Minor*, Adjudication and Termination Order, 5/9/2017, at 2.  On May 9, 2017, the trial court entered a decree involuntarily terminating each father's parental rights to their child pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).  *See* *In Re Adoption of O.L.R., A Minor*, Adjudication and Termination Order, 5/9/2017, at 50-51; *In Re Adoption of C.L., A Minor*, Adjudication and Termination Order, 5/9/2017, at 53-56.  Neither father has filed an appeal from the voluntary termination decrees, nor is either a party to the instant appeal.

March 20, 2017, and on March 28, 2017. On May 9, 2017, the trial court terminated Mother's parental rights to the Children under 23 Pa.C.S.A. §2511(a)(2), (5), (8), and (b).

On June 8, 2017, Mother filed notices of appeal, along with concise statements of errors complained of on appeal. On June 13, 2017, the trial court filed a Pa.R.A.P. 1925(a) statement in the matter of each child, suggesting that Mother had waived all claims for lack of specificity but directing our attention to its prior opinions entered on May 9, 2017. Trial Court Rule of Appellate Procedure 1925(a) Statement, *In Re Adoption of O.L.R., A Minor*; Trial Court Rule of Appellate Procedure 1925(a) Statement, *In Re Adoption of C.L., A Minor*, 6/13/2017. This Court, acting *sua sponte*, consolidated Mother's appeals on July 5, 2017.

In her brief on appeal, Mother raises the following issue:

1. Whether the trial court erred in granting the York County Office of Children, Youth and Family's petition for involuntary termination of parental rights of [R.L.] where the agency failed to meet its burden of proving the elements of 23 Pa.C.S. § 2511 and termination would not be in the best interest of the children.

Mother's Brief, at 4.[2]

_____

[2] Mother raised a single, identical issue in the appeal of each child. Additionally, Mother has waived any challenge to the change in the Children's permanency goal to adoption under 42 Pa.C.S. § 6351 by failing to raise the issue in her concise statement and Statement of Questions Involved in her brief. **See Krebs v. United Refining Company of Pennsylvania**, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an
*(Footnote Continued Next Page)*

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. **In re: R.J.T.**, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. **Id.**; **R.I.S.**, [36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. **Id.**; **see also Samuel Bassett v. Kia Motors America, Inc.**, 34 A.3d 1, 51 (Pa. 2011); **Christianson v. Ely**, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. **Id.**
>
> As we discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. **R.J.T.**, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an

_(Footnote Continued)_ —————————

appellant waives issues that are not raised in both his concise statement of errors complained of on appeal and the Statement of Questions Involved in his brief on appeal). However, we decline the trial court's invitation to find waiver of Mother's single issue in the interest of judicial economy.

error of law or an abuse of discretion. ***In re Adoption of Atencio***, 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-827 (Pa. 2012) (some formatting added).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained:

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

***Id.*** (quoting ***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the decision to terminate parental rights if we agree with the trial court as to any one subsection of section 2511(a) and its decision as to section 2511(b). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). The trial court terminated Mother's parental rights to the children under section 2511(a)(2), (5), (8), and (b), which provide, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence

necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). We will focus on Section 2511(a)(2), and adopt the trial court's discussion in its adjudication and termination orders as this Court's own.

The Supreme Court set forth our inquiry under section 2511(a)(2) as follows.

> As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .
>
> This Court has addressed incapacity sufficient for termination under § 2511(a)(2):
>
>> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.
>
> *In re Adoption of J.J.*, 515 A.2d 883, 891 (Pa. 1986) (quoting *In re: William L.*, 383 A.2d 1228, 1239 (Pa. 1978).

*In re Adoption of S.P.*, 47 A.3d at 827 (some formatting added).

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness

regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

With regard to section 2511(a)(2), Mother argues that the trial court erred when it concluded that the Agency presented clear and convincing evidence in support of its petitions for termination for parental rights. Mother's Brief at 9. Mother asserts that she has remedied the conditions that brought the Children into care and that she is capable of parenting them at this time. *Id.* at 12-13. Additionally, Mother suggests that her sustained participation in various resources over the years undermines the evidence presented by the Agency. *Id*.

The trial court assessed in depth the evidence regarding Mother's repeated incapacity to parent Children, and her inability to remedy the conditions and causes of her incapacity to parent Children, which we adopt herein. *See In Re Adoption of O.L.R., A Minor*, Adjudication and Termination Order, 5/9/2017; *In Re Adoption of C.L., A Minor*, Adjudication and Termination Order, 5/9/2017. The trial court found that Mother's mental health conditions remain an ongoing concern, and her inability to properly guide the children or improve home conditions could not be remedied with prompting and assistance from service providers. *Id*. at 42-44. Moreover, the trial court specifically noted that the environmental conditions that led to the removal of the children were not beyond Mother's control, and the conditions remained the same, if not worse, in May 2017. *In Re Adoption of*

*C.L., A Minor*, Adjudication and Termination Order, 5/9/2017, at 44-45, 48, 52.

After a careful review of the record, we find that termination of Mother's parental rights to the Children was warranted pursuant to section 2511(a)(2), as the evidence showed that Mother will be unable to remedy the conditions that led to the removal of the Children within a reasonable period of time, if ever. As there is competent evidence in the record that supports the trial court's findings and credibility determinations, we discern no abuse of the trial court's discretion in terminating Mother's parental rights to the Children under section 2511(a)(2). *In re Adoption of S.P.*, 47 A.3d at 826-27.

Next, this Court has stated that the focus of our inquiry in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and

child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

In the present matter, the trial court considered the needs and welfare of the Children and provided an explanation of why its termination decision was not based on matters that were outside of Mother's control. We adopt the trial court's discussion herein. *See In Re Adoption of O.L.R., A Minor*, Adjudication and Termination Order, 5/9/2017, at 46-50; *In Re Adoption of C.L., A Minor*, Adjudication and Termination Order, 5/9/2017, at 49-53. The trial court properly considered the best interests of the Children in rendering its decision that although there was evidence of a bond between the Children and Mother, it was in their best interests to sever that bond for their safety and security needs. *In re T.S.M.*, 71 A.3d at 268–69.

After a careful review of the record, we find that termination of Mother's parental rights to the Children was warranted pursuant to section 2511(b), as the evidence showed that the Children's developmental, physical and emotional needs and welfare will best be met by the termination of Mother's parental rights. Further, the evidence showed that the bond between Mother and Children has weakened over time, and the effect of severing the bond does not seem to be severe. *See In Re Adoption of O.L.R., A Minor*, Adjudication and Termination Order, 5/9/2017, at 48; *In Re Adoption of C.L., A Minor*, Adjudication and Termination Order, 5/9/2017, at

51. Moreover, the trial court concluded that the unaddressed safety concerns outweigh the bond between Children and Mother.

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.,* 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted).

The court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of ... her child is converted, upon the failure to fulfill ... her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted). It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

The trial court found that Mother "does love her children and is able to provide minimal comfort, but is not able to provide security and stability. Mother has not been able to adequately perform her parental duties, has not adequately addressed her mental health, continues to use marijuana, and remains in a relationship that involved domestic violence." *See In Re Adoption of O.L.R., A Minor*, Adjudication and Termination Order, 5/9/2017, at 48; *In Re Adoption of C.L., A Minor*, Adjudication and Termination Order, 5/9/2017, at 51. As we stated in *In re Z.P.,* the Children's lives "simply cannot be put on hold" in the hope that Mother will summon the ability to handle the responsibilities of parenting. *In re Z.P.*, 994 A.2d at 1125. Here, Mother's right to the custody and rearing of her Children was converted to the Children's right to have proper parenting and fulfillment of their potential in a permanent, healthy, safe environment. *In re B., N.M.*, 856 A.2d at 856.

As there is competent evidence in the record that supports the trial court's findings and credibility determinations, we would find no abuse of the trial court's discretion in terminating Mother's parental rights to the Children under section 2511(b). *In re Adoption of S.P.*, 47 A.3d at 826-27. We, therefore, affirm the trial court's decrees terminating Mother's parental rights to the Children.

Decrees affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/13/2018

**IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA**

In Re: Adoption of         :
     C. L.,             :     No. 2016-12
         A Minor        :     Termination of Parental Rights

APPEARANCES:

Wanda Neuhaus, Esquire            Daniel Worley, Esquire
Office of Children, Youth & Families     *Guardian Ad Litem*

Peter Vaughn, Esquire             Andrew Lee Raver,
Counsel for Mother               Pro Se.

                                      **FILED**
Thomas Gregory, Esquire
Counsel for **C. L.**               Mo. 5 Day 09 Year 17

             **ADJUDICATION**          ORPHANS' COURT DIVISION

     Presently before the Court is the Petition for Involuntary Termination of Parental Rights of Andrew Lee Raver and Rebecca Lynch to  **C. L.**  filed by York County Children, Youth, and Family (hereinafter "Agency") on January 25, 2017. An evidentiary hearing was originally scheduled for, and was conducted on, March 20, 2017. At the hearing on March 20, 2017, a continued hearing was scheduled for March 28, 2017, due to insufficient time to present evidence. At the time of the hearing, the Guardian Ad Litem advocated for the children. The Supreme Court recently reminded us in *In re Adoption of L.B.M.*, 84 MAP 2016, 2017 WL 1162209 (Pa. March 28, 2017) that the child is entitled to counsel pursuant to §2313(a). Therefore, the Court appointed legal counsel for the child, afforded counsel the opportunity to meet with his client, review the record and request additional proceedings if he deemed it warranted to protect the legal interest of the child.

1

#21

Counsel recommended the child not be returned home but instead, should remain with the foster family.

Based upon the evidence presented at the hearings, and upon consideration of the record, the Petition for Involuntary Termination of Parental Rights of Mother and Father to C. L. is GRANTED for the reasons outlined herein.

## FINDINGS OF FACT

1. The record docketed at CP-67-DP-12-2015 with the Clerk of Courts in the Court of Common Pleas in York County was incorporated into the Orphans' Court record docketed as above with no objection.

2. Rebecca Lynch (hereinafter "Mother") is the natural mother of C. L. (hereinafter "C.L.").

3. Mother currently resides at 729 Poplar Street, 1st Floor, York PA 17402.

4. Andrew Lee Raver (hereinafter "Father") is the legal father of C.L.

5. Father currently resides at 348 Lexington Street, York PA 17403.

6. A Certification of Acknowledgment of Paternity was filed on January 25, 2017, indicating there is not a claim or Acknowledgment of Paternity on file with BCSE for C.L. Father was declared the legal father of C.L. as the result of a DRS action.

7. C.L. has three half-siblings, O. L. R. (hereinafter "O.L.R.") and J. C. (hereinafter "J.C."), whose hearings and reviews were conducted simultaneously with hearings that pertained to C.L., as well as another half-sibling, who has not been the subject of any court proceedings.

2

8. The York County Office of Children, Youth and Families (hereinafter "Agency") filed an application for emergency protective custody on January 20, 2015. The contents of the application are incorporated herein. Allegations presented in the application included:

a. The Agency had extensive involvement with the family due to environmental concerns and mother's mental health issues.

b. The family was accepted for services in 2014 to assist Mother in caring for the children, obtaining appropriate and stable housing, and providing the mother with community resources and services.

c. Services were subsequently terminated when Mother signed guardianship of the children over to Deborah McMillan (hereinafter "Maternal Grandmother").

d. Mother was residing with Maternal Grandmother.

e. Mother was on probation for assault.

f. On January 9, 2015, the Agency received a referral due to Mother's hospitalization as a result of a suicide attempt on January 8, 2015. Mother indicated the suicide attempt was made because the "baby dad denies their son".

g. Mother tested positive for marijuana at the time of her admission into the hospital. She admitted to using marijuana and marijuana laced with Heroin.

h. Mother was diagnosed with Bi-Polar Disorder, Attention Deficit/Hyperactivity Disorder, Depression, and Borderline Personality. Mother also has a history of cutting behaviors.

3

i. Mother alleged she was the victim of domestic violence in her relationship with her then paramour.

j. Father of the child was unknown.

k. On January 13, 2015, Mother left the hospital against medical advice and refused to comply with counseling and other services.

l. Maternal Grandmother agreed to continue to care for the children and was advised Mother could not live in the home.

9. A shelter care hearing was held on January 22, 2015. The Court at that time made the following findings, *inter alia*:

a. Return of C.L. to Mother or Father was not in the best interest of the child.

b. Issues with C.L.'s hearing and legs were to be evaluated.

c. C.L. should remain in the care of Maternal Grandmother.

10. The Agency filed a dependency petition on January 27, 2015 on behalf of each child. The contents of the petition are incorporated herein. The allegations presented in the application for emergency protective custody, as outlined previously, were reiterated in the petition, *inter alia*.

11. At an adjudicatory hearing held on February 13, 2015, the children were adjudicated dependent by the Court. The contents of the Orders are incorporated herein. The Court at that time made findings that included, but are not limited to:

a. All parties were in agreement with the children remaining in the legal and physical custody of Maternal Grandmother. Mother and Father were not resources for the

4

child.

b. The children were doing well.

c. The goal for the child was placement with a fit and willing relative. A concurrent goal was return to parent.

12. The Agency filed an application for emergency protective custody on April 8, 2015. The contents of the application are incorporated herein. Allegations presented in the application included, *inter alia*:

a. The Agency received information that Maternal Grandmother allowed unsupervised contact between Mother and the children.

b. The Agency met with Maternal Grandmother and advised her she was in violation of the supervision requirement in the Family Services Plan, which required Maternal Grandmother to monitor all contact between Mother and the children. The Agency reminded Maternal Grandmother that no unsupervised contact may occur between Mother and the children.

c. The Agency was advised Maternal Grandmother again allowed Mother to have unsupervised contact with the children.

d. The Court, after being informed of the unsupervised contact, verbally directed that the children remain in the care of Maternal Grandmother provided there is no further unsupervised contact between the Mother and the children. It was further directed that should Mother have further unsupervised contact, the children would

5

be removed immediately from the custody of Maternal Grandmother and placed in foster care.

    e. On April 8, 2015 the Agency representatives met with Maternal Grandmother and informed her of the directives of the Court. Maternal Grandmother stated she could no longer continue to care for the minor children. She stated she does not have a support system. Mother comes to her house and "manipulates and harasses" her, and she feels she is not adequately providing what the children need.

    f. Mother had not addressed the issues which lead to placement of the children.

    g. The Agency submitted a request for an in-home team to be assigned to Mother at Mother's request.

    h. Father of the child was unknown at that time.

13. A shelter care hearing was held on April 13, 2015. The Court at that time made the following findings, *inter alia*:

    a. Sufficient evidence was presented to prove that continuation of the child to the home of Maternal Grandmother is not in the best interest of the child.

    b. To allow the child to remain in the home would be contrary to the child's welfare and reasonable efforts were made by the Agency to prevent or eliminate the need for removal of this child from the home.

14. At a dispositional review hearing on May 6, 2015, the court found:

    a. C.L. was frequently falling and the foster mother was concerned about developmental delays. It was directed that C.L. be referred for an orthopedic

6

evaluation as a result. It was further directed that C.L. is to be referred for a hearing assessment. C.L. was evaluated by Early Intervention and it was determined he is significantly delayed in adaptive, social and communication skills.

b. Foster mother expressed concerns about the children being returned from visits without having their diapers changed.

c. Mother resided with Maternal Grandmother, although she previously resided on Queen Street and failed to notify the agency when she moved.

d. Mother missed her psychiatric appointments on two occasions. She had an appointment set up for June 22, 2015. Mother's mental health was unstable and she was not following through with her counseling. She missed three appointments. Mother stated that although she did not like counseling, she would contact her father's counselor to make an appointment.

e. Mother did not follow through with the recommendation of MH-IDD for her to participate in a group home for life skills and social skills. She was unhappy with her MH-IDD caseworker and requested a different caseworker be assigned.

f. A Pressley Ridge team had been assigned to Mother, but services had not yet begun. They tried to contact her three times with no response. Mother stated she was too busy to meet with them.

g. Mother completed her terms of probation.

7

h. Mother had contact with the Agency regarding visitation and did attend three visits. Mother had not attended any of the evaluations for the children since they were placed in foster care.

i. Mother states she had an employment interview but has not yet started work.

j. Andrew Raver was present and identified as a putative father of C.L. He contacted the Agency and indicated he would like to work on reunification.

15. A Court Appointed Special Advocate (CASA) was appointed for the child on May 22, 2015.

16. A combined Placement Review and Dispositional Review Hearing was held on July 20, 2015. At that time the Court made findings, in consideration of all evidence presented, which include, but are not limited to:

a. With regard to C.L.:

i. He was evaluated by Early Intervention and it was determined he was significantly delayed in adaptive skills, social skills and communication skills. He was meeting with Early Intervention weekly and making progress.

ii. He was seen by a physician who reported his physical development is normal.

iii. He was doing extremely well in his foster home and is being taught to properly eat his food.

b. With regard to Mother:

8

i. Her mental health continued to be unstable and she continued to not adequately address her mental health issues. She was seeing a psychiatrist and was missing appointments. She did begin individual outpatient counseling at Pressley Ridge and began working with an in-home team through that same agency. In addition, she received intensive case management through MH-IDD.

ii. There were seven attempts to drug test Mother. Three tests were positive, one was negative, for one she was unavailable, one she was unable to provide a specimen, and one she refused to provide a specimen. She did have a prescription for Ativan, which may have been the cause of positive test results. She was instructed to take three pills per day but was not taking it as prescribed.

iii. She received assistance from the Pressley Ridge team in applying for SSI benefits and did qualify for benefits retroactively from 2010 for her multiple mental health diagnoses, which included Disassociate Identity Disorder, Panic Disorder, panic anxiety, Mood Disorder, Bi-Polar Disorder, and Depression, among others.

iv. She resided with Maternal Grandmother but anticipated finding housing when she received payment for her SSI benefits. Mother expected to receive several thousand dollars, which she would use to establish a suitable residence for herself and the children.

9

v. She was employed briefly but was involuntarily terminated.

vi. She attended weekly supervised visitation with the children but did miss one visit. She showed signs of being overwhelmed at the visits. During one visit mother did act against the advice of the team and her actions caused O.L.R. to vomit. The team continued to assist Mother in developing appropriate parenting skills. There were concerns regarding arguing between the parents during the visits, which was causing a disruption.

c. With regard to Father:

i. Andrew Raver was served by Domestic Relations in a support matter. He failed to appear and as a result he was determined to be the legal father of C.L.

ii. He had contact with the Agency but indicated he will not cooperate with services at this time.

iii. He did attend an appointment at OSS with C.L.

iv. He also requested visitation. He arrived late to the first visit and stopped attending the scheduled visits after that time. He had not responded to any of the Agency's attempts to contact him.

v. He tested positive for THC in June and stopped cooperating with drug testing.

10

17. The Agency filed a Motion for Modification of Placement on August 20, 2015 and the Court entered an Order on that same date approving placement of the child with a different foster family. C.L. remained with his siblings.

18. A 90-day Review hearing was held on October 20, 2015. The court made the following findings, *inter alia*:

    a. C.L. was receiving speech instruction through Early Intervention. A hearing test had been scheduled for C.L.

    b. With regard to Mother:

        i. She continued to reside with Maternal Grandmother and was looking for independent housing.

        ii. She was pregnant with her fourth child.

        iii. She continued to be unemployed after briefly worked at Dunkin Donuts, where she voluntarily terminated her employment due to conflict with employees and her receipt of SSI benefits.

        iv. She was receiving outpatient counseling through Pressley Ridge and had been consistent with her appointments. The Pressley Ridge in-home team worked with her on parenting skills and managing her mental health.

        v. She was seen by a psychiatrist at True North.

        vi. She had a prescription for Tegretol and Atavan, to be taken as needed, and had tested negative on drug tests for three months.

11

c. With regard to Father:

    i. He did not maintain contact with the Agency.

    ii. He indicated he did not want visits or services until a paternity test is completed, though he failed to show for the paternity typing that was scheduled through domestic relations.

19. A Permanency Review Hearing was held on December 21, 2015, at which time the Court made the following findings, which include but are not limited to:

a. With regard to C.L.:

    i. C.L. was transferred to a new foster home and is doing well.

    ii. C.L. received services through Early Intervention Weekly.

    iii. C.L. had been seen by a number of physicians and was doing well.

b. With regard to Mother:

    i. She still resided with Maternal Grandmother but stated she would sign a lease the following day for independent housing.

    ii. Her medications were modified due to her pregnancy and she was taking Benadryl to stabilize her moods.

    iii. She attended weekly outpatient counseling sessions but had rescheduled three appointments.

    iv. She continued to test negative for drugs.

    v. She attended supervised visits twice per week for two hours at a time. The visits were going well and Mother was able to manage the children.

12

c. Father continued to have limited contact with the Agency. He was requested to contact the Agency and did not respond. He did not attend the hearing. A referral was made for Father through Families United, however, he refused to cooperate.

20. As part of the Court-Ordered Services & Conditions, which were included as an appendix to the Permanency Review Order and incorporated in the Order, the parents were directed to comply with various conditions, including:

    a. Mother and Father shall maintain safe, stable and appropriate housing for the children and shall maintain stable, lawful income to support the children.

    b. Mother and Father shall undergo random drug testing.

    c. Mother and Father shall cooperate in obtaining a psychological evaluation within ten days of the date of the Order and follow through with any recommendations made as a result of the evaluation.

    d. Mother and Father shall attend individual counseling sessions.

    e. Mother and Father shall cooperate with the Intensive Family Services Team.

21. A Status Review Hearing was held on March 22, 2016, at which time the Court made the following findings, which were stated in the Order, *inter alia*:

    a. C.L. continued to do well in his foster home. He was developmentally on target but did have speech delays for which he works with Early Intervention.

    b. With regard to Mother:

        i. She was making moderate progress at that time.

13

ii. She resided in independent housing. A home assessment was completed and it was found that the home itself was appropriate for reunification. There was concern, however, in relation to the entrance to the third floor apartment, which is accomplished through something similar to a fire escape.

iii. She had been attending outpatient counseling through Pressley Ridge since September 2015.

iv. She was prescribed medication while under the care of True North, however, those medications were discontinued during her pregnancy and would be resumed following the birth of her child.

v. She attended four-hour visits twice per week with the children. Pressley Ridge reported, under the team's supervision, Mother was attuned to the children's needs during the visits, used appropriate discipline, and prepared food and snacks.

vi. Mother's paramour was awaiting a risk of harm evaluation.

c. With regard to Father:

i. He made no progress and had not contacted the Agency except in regard to hearing that day.

ii. He had not participated in drug testing, a psychological evaluation or visits.

iii. He expressed a desire to be more involved and was given instructions on contacting the Agency to make arrangements.

14

iv. He reported he has stopped using marijuana.

22. A Permanency Review Hearing was held on June 6, 2016. At that time the Court made the following findings, which were stated in the Order and include but are not limited to:

    a. C.L. received services through Early Intervention to address speech and motor skills delays. He was nearly potty-trained at that time.

    b. With regard to Mother:

        i. She had been meeting with a team from Pressley Ridge for nearly a year. There had been moderate compliance with the permanency plan. There was continued concern with Mother's mental health. She did begin taking her prescribed medications again after the birth of her child. She also had a mental health plan and had been attending therapy. In addition, she identified a guardian if "she is not stable and she is hospitalized against her will."

        ii. She continued to reside in independent housing, with her paramour and their son, **D.**, although she was again reminded that she needed to seek proper housing as the only entrance to the residence is similar to a fire escape and this required assistance for Mother to get the children into the home.

        iii. She was living with her significant other and there were continued concerns about his threat of harm to the children relating to an aggravated assault charge.

15

iv. The children visit with mother at her home under the partial supervision of the team. She had established a structure for sleeping and feedings and there was improvement with the structure of the home. The team was recommending expansion of visits, but Mother continued to have unsafe access to her home.

v. Drug testing of Mother ended in March 2016. There were forty-eight (48) attempts made and of the forty-eight (48), eleven (11) were positive for Ativan, twenty (20) were negative and she was unavailable for fourteen (14).

c. As it relates to Father:

i. There had been minimal compliance with the permanency plan. He continued to state he will not visit C.L. until a paternity test is completed. He had the paperwork but had not provided Mother with the packet to complete.

ii. He had been criminally charged with intent to deliver and conspiracy as well as related gun charges.

23. As part of the Court-Ordered Services & Conditions, which were included as an appendix to the Permanency Review Orders, the parents were directed to comply with various conditions, including:

a. Both parents shall maintain safe, stable and appropriate housing for the children and shall maintain stable, lawful income to support the children.

16

b. Both parents shall undergo random drug testing.

c. Both parents shall cooperate in obtaining a psychological evaluation within ten days of the date of the Order and follow through with any recommendations made as a result of the evaluation.

d. Both parents shall attend individual counseling sessions.

e. Both parents shall cooperate with the Intensive Family Services Team.

24. A Status Review was held on September 6, 2016 at which time the Court found, *inter alia*:

   a. With regard to Mother:

   i. There continued to be domestic violence issues between Mother and her paramour. Her paramour was recommended to complete a batterer's intervention through SpiritTrust Lutheran, but he had not contacted the same. Mother was recommended to meet with a domestic violence group through Access York.

   ii. Her visits remained supervised.

   iii. She had four positive tests for Marijuana since August 15, 2016 to the date of the hearing on September 6, 2016. She admitted use of Marijuana and reported being out of her medication. She did not request assistance to secure additional medication.

   iv. She continued to reside in the third floor apartment that had an unsafe ingress/egress. She was offered the second floor apartment, but did not move. She was promised the first floor apartment that was then being

17

renovated. Though she was offered other housing options, she chose not to take advantage of them.

    b. Father had not maintained contact with the agency or the child.

25. Mother filed a Petition to Resume Partially Unsupervised Visitation with Mother on September 9, 2016. A hearing was held before the Court on September 21, 2016. and the Court issued the following directives:

    a. Visits with Mother shall continue to be supervised, whether in Mother's home or in the community.

    b. No unsupervised contact shall be permitted unless the concerns related to domestic violence issues within the home are first addressed and her paramour is drug tested on a random basis and tests negative prior to any unsupervised contact occurring.

26. At a Permanency Review Hearing held on November 14, 2016, the Court made the following findings, *inter alia*:

    a. C.L. attended Head Start two days per week and is doing well.

    a. With regard to Mother:

        i. Mother was compliant with Pressley Ridge services. She completed the requirements for the Pressley Ridge team and they closed their service.

        ii. She was afforded unsupervised visits in the first floor apartment as the agency failed to appear to partially supervise the visit.

        iii. Mother continued to struggle to keep the home clean and safe.

18

iv. She refused domestic violence treatment though she and her paramour would begin couples counseling once he completed two counseling sessions at PA Counseling.

b. Father did not maintain contact with the Agency or with C.L. Father had advised the Agency he is not a resource for C.L. due to pending criminal charges.

27. A Petition for Involuntary Termination of Parental Rights as to both parents was filed on January 24, 2017, alleging grounds under 23 Pa. C.S.A. § 2511 (a)(1), (2), (5), and (8).

28. A Status Review Hearing was held on February 15, 2017. The Court, at that time, made the following findings:

a. With regard to C.L.:

i. C.L. attended Head Start two days per week. He was attending church with the foster family weekly and attending a church club program on Wednesdays. He is thriving in the home of the foster parents who ensure that he continues to see his half-brother, JC.

ii. He was up to date on all his medical appointments and had a dentist appointment scheduled.

iii. He was doing well with potty-training in the foster home but seemed to be wetting himself frequently during visits with Mother. The driver reported picking up the child from visits with Mother and the child was wet and smelled of urine. C.L. informed driver he wet his pants and Mother did not change him.

19

b. As it relates to Mother:

    i. She had weekly, semi-supervised visits in her home with the children. Reports indicated that Mother and her significant other are often yelling and arguing during visits. Mother yelled and spoke harshly to the children.

    ii. She had been cooperative with drug testing since August. She tested positive for THC in January and again in the beginning of February. She tested negative on the date of the hearing for everything but benzodiazepines, for which she has a prescription for Alprazolam. She was directed to submit to a hair follicle test within forty-eight (48) hours of the hearing.

    iii. She received individual therapy to address domestic violence and anger management issues. She was unsuccessfully discharged for non-attendance. She declined treatment from True North.

    iv. She was scheduled for an intake with PA Counseling, but rescheduled the appointment.

c. Father had not maintained contact with the Agency or C.L. Father pled guilty to a drug delivery charge on October 11, 2016 and was sentenced to three years of probation.

29. At the termination of parental rights hearing held on March 20, 2017, and the continued hearing on March 28, 2017, the Court found the following evidence credible, which includes but is not limited to:

20

a. As it relates to Mother:

   i. The Agency was previously involved with Mother in May of 2013. A referral, related to O.L.R., was made for lack of supervision and physical abuse; the Agency did not open for services.

   ii. On January 1, 2014, in response to a referral based on environmental concerns and Mother's mental health issues, the family was accepted for services. Catholic Charities became involved but Mother was discharged from services with them for non-cooperation. The Agency later closed services due to Mother signing over guardianship of the children to Maternal Grandmother.

   iii. The Agency received another referral in November of 2014, however, services were not opened at that time.

   iv. Once again, in November 2015, the Agency received a referral due to concerns relating to Mother's mental health. It was unclear at the time if the children were living with Mother. Mother was hospitalized shortly thereafter due to a suicide attempt. In response, the Agency was granted custody of the children after filing an Emergency Petition for Custody.

   v. The children were adjudicated dependent and Maternal Grandmother was granted legal and physical custody of the children.

   vi. While in Maternal Grandmother's custody, reports were made that the children were allowed unsupervised contact with Mother. The Agency,

21

upon the Court's orders, addressed the unsupervised contact with Maternal Grandmother and, in response; she requested the immediate removal of the children from her custody.

vii. On May 6, 2015, a disposition hearing was held and the children were placed in foster care. The goal at that time was reunification.

viii. A Family Service Plan (hereinafter "FSP") was established, under which Mother's goals were to cooperate with MH/IDD services, specifically DBT and individual therapy, complete a psychological and psychiatric evaluation, cooperate with random drug screens, attend medical appointments, attend visitation with the children, cooperate with Early Intervention, maintain safe and stable housing, secure stable income, and cooperate with an in home team through Pressley Ridge. In June of 2016, the Agency added the additional requirements that Mother attend a women's empowerment group or domestic violence counseling due to ongoing concerns about the domestic violence within the home.

ix. With regard to the goal of cooperating with Early Intervention, Mother did not cooperate with the initial services through Early Intervention.

x. With regard to the goal of completing a psychological and psychiatric evaluation, Mother has not completed the goal. Mother did have an evaluation completed in 2014, prior to the establishment of the current FSP. Mother has not completed an evaluation after the FSP was put in

22

place. Michael Breeland, a family therapist with Pressley Ridge, testified there were many attempts made towards this goal, yet Mother failed to complete the goal.

xi. Mother did not cooperate with MH-IDD and, as such, she did not complete the established goal.

xii. Mother did secure stable income through Social Security with the assistance of the Pressley Ridge team.

xiii. Mother did not complete the goal of attending a women's empowerment group or other domestic violence counseling. Mother did not engage in couples counseling. Mother's paramour did not complete batterer's intervention.

xiv. Mother's established goal was to cooperate with drug screening. She did complete drug testing through Families United Network. From June 9, 2015 to the present date, there have been eight-five (85) attempts to test Mother. Three (3) times Mother was unable to provide a sample and twenty-one (21) times Mother was unavailable for testing. There was one (1) refusal on June 9, 2015. There were twenty-four (24) negative results and thirty-six (36) positive results. Of the positive results, twenty-eight (28) of those were only positive for the drugs for which Mother had a prescription. One (1) test, completed on August 15, 2016, was positive for THC only. The remaining seven (7) results were positive for Mother's

23

prescription medication and THC. The positive results for THC occurred in August and September of 2016 and then again in January and February of 2017. The levels of THC indicate Mother smoked marijuana at least two times, and possibly a third time, between August of 2016 and the present time. It is also worth noting that on August 23, 2016 she tested positive for THC and benzodiazepine, despite her prescription not being filled at the time.

xv. Mother established independent housing in December 2015, eleven (11) months after the children were removed from her care. The third floor apartment, however, was not deemed appropriate due to concerns with the method of access to the apartment being similar to a fire escape. The concerns were addressed by the caseworker in court repeatedly and Mother eventually moved into the first floor apartment in September, 2016. The current apartment consists of four rooms. There is an eat-in kitchen, a room that doubles as a living room and a bedroom for Mother and Mother's paramour, and two other rooms that are available as bedrooms for children. The Agency reviewed Mother's housing in July 2015, and again in early January of 2017. Although Mother's current residence has heat and electric, as well as beds for the children, Mother still struggles with cleanliness of the home. Although the home itself is appropriate, the condition of the home is not appropriate for young children.

24

xvi.   With regard to the goal of attending visitation with the children, beginning in April of 2015, Mother attended weekly visits with the children. The visits were at the Agency and supervised by a case aid for one hour twice per week. In June of 2015, Pressley Ridge began supervising the visits and continued to do so through October of 2015, when the visits were moved to the Lafayette house. Additionally, at that time, the visits were increased from one to two-hour visits. In January of 2016, the visits began to occur at the home and were semi-supervised by the team until around January 13, 2016, when Mother's paramour moved into the home and the visits were moved pending completion of a threat of harm evaluation by Mother's paramour. Beginning February 2, 2016, the visits were again supervised and they remained such until June of 2016.

Mother's paramour completed a behavioral health evaluation on June 1, 2016. The Agency accepted this evaluation in lieu of the threat of harm evaluation. No further evidence or testimony was presented in regard to the behavioral health evaluation or the results. The evaluator recommended ongoing therapeutic services for Mother's paramour and ongoing mentoring and moral support for the family. He did not comply with the recommendations and did not complete therapy.

25

xvii. With regard to the goal of attending all medical appointments and following through with recommendations for mental health services, the Court found the following testimony to be credible:

1. In 2015 MH-IDD recommended Mother attend counseling through True North. Three appointments were scheduled with True North and Mother did not attend any of the appointments.

2. Between the months of June and August of 2015, Mother attended one (1) individual therapy session.

3. Between the months of September of 2015 and March of 2016, Mother attended weekly individual therapy sessions. Those sessions ended in March of 2016 due to cancellations and attendance issues.

4. From March through October of 2016, Mother did not participate in any mental health outpatient counseling.

5. On October 31, 2016, Mother re-engaged with True North for mental health treatment with therapist Samuel Means. She completed an assessment, and attended appointments scheduled on November 18, 2016 and December 7, 2016. Mother also scheduled four consecutive sessions to occur on December 14, 2016, December 21, 2016, December 28, 216, and January 17, 2017. Mother missed the last two sessions. Mother did not attend therapy

26

sessions after that date, despite the fact her counselor recommended further anger management and domestic violence counseling. Mother was discharged on January 9, 2017, due to attendance issues.

6. Mother had an appointment with PA Counseling on February 12, 2017 which she did not attend.

7. Mother had an intake with TW Ponnessa on March 2, 2017. Although she did not meet the criteria for drug and alcohol counseling, she did receive mental health counseling. She eventually attended a session on March 13, 2017, which was ten (10) days after the petition for termination of parental rights was received by Mother.

xviii. With regard to the goal of cooperating with the Pressley Ridge team, Mother did cooperate with the initial team. The referral to Pressley Ridge was made by the Agency in April of 2015. That assignment was closed successfully in October of 2016 after approximately seventeen (17) months of intensive services. Pressley Ridge was then referred by the Agency for placement of a team again in February of 2017. The Pressley Ridge service was closed on March 8, 2017, in response to a threatening Facebook message posted by Mother's paramour, which created safety concerns for Pressley Ridge employees.

27

xix. During the involvement of the first Pressley Ridge team, from April of 2015 through October of 2016, Mother interacted with the team approximately 159 times. The Court found the following information in regard to that time to be credible:

1. Heather Lentz, a family advocate with Pressley Ridge supervised visits beginning May 6, 2015 and ending on October 21, 2016. She assisted Mother with parenting skills and techniques. There were concerns related to Mother's parenting abilities, however, she was quick to address issues after the advocate brought them to her attention. Mother often yelled at the children. When the advocate addressed this issue with Mother, she denied yelling at the children.

The advocate brought concerns about the condition of the home to Mother's attention; specifically dirty dishes, toys and other detritus lying about. Again, Mother addressed the issues after the advocate pointed them out, however, Mother was not able to self-identify issues or concerns or make any effort to correct safety concerns without the assistance of the team. Similarly, there were concerns about Mother's parenting of the children, who often climbed furniture and jumped off of it. Finally, the advocate noted that Mother appeared overwhelmed at times. Mother would step

out of the home for a cigarette break to deal with this, leaving the representative from the team to supervise the children.

2. Michael Breeland, a family therapist with Pressley Ridge, was involved with Mother during this time period. During his involvement he did witness a dirty diaper on the floor of Mother's home as well as the children running with lollipops in their mouths. He also accompanied Mother to appointments and assisted her in addressing her goals during this time.

Mother was to address the concerns regarding the entry to her third floor apartment and Mr. Breeland assisted her in contacting the rental agency. Several weeks later, during one of Mr. Breeland's visits, he escorted Mother to the office of the rental agency, where Mother was told the agency secured a new apartment for her, however, they had been trying to reach Mother and her phone was disconnected. It took Mother more than nine (9) months to address the housing issue.

During another of Mr. Breeland's visits, he assisted Mother in setting up her attendance at a women's empowerment group, as a part of her FSP goals. Mother had to use Mr. Breeland's telephone as she did not have one. She did schedule an appointment at that

29

time, however, she failed to go to the appointment. She thereafter refused to attend domestic violence counseling.

A copy of the wellness action recovery plan for Mother was given to her by Mr. Breeland. She later reported she lost her copy of the plan.

xx. By 2016, Mother was managing her mental health and was maintaining the home environment to standards that, although not high, were acceptable to the Agency. However, there were concerns about Mother's ability to manage these things without the assistance and prompting of the Pressley Ridge team. As a result, the team was closed out in October of 2016 as a step towards reunification.

xxi. On February 15, 2017, another referral was made to Pressley Ridge as a result, in part, to a visit made to the home by Jessica Jones, a supervisor with the Agency. During that visit Ms. Jones found concerning, among other things, the condition of the home and Mother's parenting skills. Old food was all over a highchair and one of the children ate the food. One of the children had a pill bottle and when Ms. Jones brought it to Mother's attention, she shook the bottle, stated it was empty, and sat it back down where the child could access it again.

xxii. Carla Arp, a family engagement specialist with Pressley Ridge supervised four visits during February and March of 2017. During these visits,

30

Mother was responsible for supervising the children. The team only intervened or offered suggestions if there was a safety concern. It was noted that Mother was not receptive to suggestions.

The Court, in consideration of Ms. Arp's testimony, found the following to be credible:

1. During a visit on February 21, 2017, Mother utilized yelling and screaming as a way to parent and did not provide proper guidance to the children on interacting with the family cat or each other. For example, when one child would strike another or engage in inappropriate interactions, Mother was not able to appropriately address the situation.

   The condition of Mother's home was deplorable. There was trash scattered throughout the home, a kitty litter box in plain view and cat droppings on the floor. In the kitchen, there were large leaf collection bags filled with trash. A medicine container was within access of the children. There were unlimited amounts of food dropped throughout the home and not cleaned up, which the children would then pick up and eat.

2. The visit on February 24, 2017 occurred mostly at a park. During that time mother allowed J.C., C.L.'s half-brother, to have seven (7) cookies, despite his need for a restricted diet. Additionally, there

31

was an incident where Mother was on the porch, talking on her telephone, while the kids were playing around a gate. J.C. ran off, and when Ms. Arp brought it to Mother's attention, she stated she was going to beat him and then leaned around the corner and yelled for him to come back.

3. On March 3, 2017 another visit took place in Mother's home. Mother's parenting skills were found to be of concern. The children were eating medicated lollipops although none of the children were ill. O.L.R., C.L.'s half-sister, was jumping off the couch with the lollipop in her mouth. Despite the fact this issue has been addressed with Mother in the past, Mother did not address the behavior until Ms. Arp brought it to her attention. `D.`, C.L.'s half-brother, had learned to walk that very day and was doing so with a lollipop in his mouth. When asked to address this, Mother stated he's fine.

Additionally, there was an occasion when Mother instructed one of the children to reach amongst burning candles, which were positioned along the edge of the counter, to get a candle that was not yet lit.

32

Mother also had inappropriate conversations with the children. Specifically, she discusses the foster parents with them and at one point told O.L.R. that her father wants nothing to do with her.

The condition of the home was also of great concern during this visit. Ms. Arp reports trash, clutter and food everywhere and in fact stated the condition of the home was the worst she had seen. There were no clean utensils or dishes, causing the children to have to eat their lunches out of baking pans. The mattress in the living room, which doubles as a bedroom for Mother and her paramour, was filthy.

At one point Mother had to step outside to calm herself after being served with court documents. Ms. Arp supervised the children at that time and heard the children arguing over bubble gum. When she investigated she found that one of the children had something in his mouth. Further investigation proved the child was chewing on a used urine strip from a pregnancy test.

4. Due to the conditions of the home and concerns for the safety of the children, the final visit observed by the team in March 2017 was held at the Lafayette House. The children were jumping off of the furniture and mother failed to properly address the issue. Mother also had inappropriate conversations with the children regarding the

33

foster parents and spent much of the time on the telephone with her paramour.

xxiii. In the last six months, Mother had performed some parental duties for the children. During visits she would interact with the children. She would do the children's hair or cook for the children, however, she often resorted to sitting on the couch watching television with the children. During one particular visit, the family specialist noted C.L. watched television for nearly the entire duration of the visit. During other visits Mother spent her time on a video conference with her paramour, which inhibited her ability to supervise the children.

xxiv. Mother's paramour has been living with her since 2015. They anticipate getting married. He admits to using marijuana and having a problem with anger. He believes Mother's mental health is "perfect" and that the condition of the home is good. He believes Ms. Arp lied with regard to Mother being on the telephone with him during visits. He denied talking to the police the weekend prior to the hearing. Mother's paramour was not a credible witness.

xxv. Mother did testify with regard to C.L. that since he was removed from the home he has pushed himself away from her and it was as if he did not know who she was any more.

34

xxvi. The testimony of maternal grandfather was not relied upon by the Court as credible.

xxvii. The Agency does not believe that Mother is in a position to return to partially supervised visits and, as such, visits have not progressed to the point where they were unsupervised. There have been numerous concerns throughout the course of the dependency action regarding parenting, environmental issues in the home, and a lack of overall parental supervision. Mother has stated she does not feel there are any services which the Agency did not provide.

xxviii. It was reported that the weekend previous to the hearing, the police were called to the Mother's home due to an altercation between Mother and her paramour. At that time, the police also expressed concerns about the condition of the home. Mother testified that the condition of the home "had nothing to do with me" as it was her paramour who "trashed" everything.

xxix. The most concerning issue is Mother's mental health, which she has not consistently addressed. In Mother's own words, her mental health is stable "as of right now". However, she has not shown an ability to sustain stability of her mental health for any meaningful length of time since 2014.

xxx. Mother has not completed her goals. Between December of 2015 and August of 2016, Mother made only moderate progress in accomplishing

35

her goals and only due to the intensive services provided by the team. By September of 2016, she was only able to make minimal progress in accomplishing her goals. By the hearing on the petition to terminate her parental rights, the condition of her home had again significantly deteriorated.

xxxi. The children have been out of the home for twenty-five (25) months. There has never been an overnight visit with Mother during that time.

b. As it relates to Father:

i. Father's goals were to cooperate with random drug and alcohol testing, to maintain safe, appropriate, and stable housing, to provide the Agency with proof of income, to notify the Agency if he wishes to cooperate with a home team, to attend regular visitation with C.L., and also to cooperate with C.L.'s early intervention services.

ii. Father has not met his goals.

iii. He attended only one visit in April of 2015. He failed to call or appear for two subsequent visits. He has not requested any further contact with the C.L.

iv. Father was tested for drugs on twelve (12) occasions between June 8, 2015 and September 8, 2015. Father was unavailable for eight (8) of the tests, refused three (3) tests and tested positive for one (1) test.

c. As it relates to C.L.:

36

i. Foster father reported that the child has lived with the foster family since August of 2015 and is doing well in the foster home.

ii. The family attends church on Wednesday nights and again on Sunday.

iii. C.L. received speech therapy while in the care of the foster parents. He had an appointment scheduled with Capital Intermediate Unit the week of the hearing for another speech evaluation. It was recommended C.L. receive additional services. His speech is behind, but he is blossoming in his speech.

iv. The last time Early Intervention was in place was approximately September or October of 2016. He was involved for approximately 1 year then aged out of the service.

v. C.L has resided with his half-sister, O.L.R. The foster parents have also maintained some visits between C.L. and a half-sibling, J.C., who was reunified with his father.

vi. C.L. has tantrums, gets angry, and screams "No" when asked to wash his hands. He stabilizes fairly quickly, however, and it is believed C.L. is simply going through a stage.

## DISCUSSION

The Agency petitioned this Court to involuntarily terminate the parental rights of Mother and Father to C.L. and O.L.R., arguing the following portions of the Adoption Act, found in Title 23 of the Pennsylvania Consolidated Statutes, are relevant:

37

## §2511. Ground for involuntary termination

(a) **General Rule.** – The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

    (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

    (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

***

    (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to removal or placement of the child within a reasonable period of time and termination of parental rights would best serve the needs and welfare of the child.

***

    (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with the agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of

38

the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

(b) **Other considerations.** – The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b).

"Parental rights may be involuntarily terminated where any one subsection of 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa.Super. 2010). The party seeking termination of parental rights must demonstrate the validity of the asserted grounds for termination by "clear and convincing evidence." *In re R.N.J.*, 985 A.2d 273, 276 (Pa.Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa.Super. 2005)). Clear and convincing evidence is defined as evidence "so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa.Super. 2003)). It is the role of the court to "examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants the involuntary termination." *In Interest of A.P.*, 692 A.2d 240, 245 (Pa.Super. 1997).

39

## Section 2511(a)(1)

Termination of parental rights pursuant to Section 2511(a)(1) does not require the Agency to produce evidence of both an intent to relinquish parental claims on the child and a failure to perform parental duties. *In re C.M.S.*, 832 A.2d 457, 461 (Pa.Super. 2003) (citing *Matter of Adoption of Charles E.D.M., II.* 708 A.2d 88, 91 (Pa. 1998)). With regard to what is considered parental duties, the Supreme Court of this Commonwealth has stated:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.'

*In the Interest of A.P.,* at 245 (citing *In re Burns*, 379 A.2d 535 (Pa. 1977)).

It is clear in the case at hand that Mother has not evidenced a settled purpose of relinquishing parental claim to C.L. Mother has participated in services and made attempts to accomplish the goals outlined for her by the Agency. Furthermore, out of more than one-hundred and fifty (150) scheduled visits with the children, Mother only missed two.

40

As to whether Mother failed to perform parental duties, there is evidence to suggest that while she did not perform some parental duties, she did adequately perform others. There is no doubt Mother loves her children. She has established a residence separate from Maternal Grandmother and income. She often cooked for the children and provided snacks. She did the children's hair, maintained a bed for each child and did demonstrate proper parenting skills when supervised and directed to do so.

Father, on the other hand, has both evidenced a purpose of relinquishing parental claim to C.L. and failed to perform parental duties. Father attended one visit with C.L. and failed to appear for visits after that time. He has repeatedly failed to communicate with or respond to the Agency. Father refused to participate with services until a paternity test was completed but then failed to appear for said paternity test. Father failed to adequately participate in drug testing and did not obtain a psychological evaluation.

Therefore, the Court cannot find that termination of Mother's parental rights pursuant to Section 2511(a)(1) is appropriate based on the credible evidence presented, but does find that termination of Father's parental rights under this section is appropriate.

A detailed discussion of Section 2511(b) appears herein.

### Section 2511(a)(2)

Section 2511(a)(2) focuses on the child's present and future need for proper care. *In re Involuntary Termination of Parental Rights to E.A.P., a Minor*, 944 A.2d 79, 82 (Pa.Super. 2008) (hereinafter "E.A.P.") (citing 23 Pa.C.S.A. § 2511(a)(2); see *In re R.I.*, 361 A.2d 294 (Pa. 1976)). Whether termination is appropriate under Section 2511(a)(2) is not limited to

41

affirmative misconduct, rather includes the incapacity to perform parental duties as well. *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Id.* At 340. Subsection (a)(2) emphasizes the child's "need for essential parental care, control, or subsistence necessary for his physical or mental well-being." *E.A.P.*, 944 A.2d at 82.

The Court in *In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998) had the following to say about what is now Section 2511(a)(2):

> The fundamental test in termination of the parents' rights was long ago cited in *In re Geiger*, 459 Pa. 636, 331 A.2d 172 (1975). There, the Pennsylvania Supreme Court announced that pursuant to IPS section 311(2) of the Adoption Act of 1970, now section 2511(a)(2) of the Adoption Act, the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *Id.* at 639, 331 A.2d at 174.

*Id.* (citing *In re Geiger*, 331 A.2d 172, 174 (Pa. 1975)).

Mother's incapacity due to her mental health conditions remains an ongoing concern since the removal of the children from the home and, furthermore, the concerns with regard to the home environment have repeatedly been noted during that time. These concerns have led to the children being without proper parental care.

During visits with Mother, she repeatedly failed to properly guide the children and provide a healthy environment for the children to the point where their safety was called into question, and visits were moved out of Mother's home. Mother has never been able to

42

remedy the causes of her incapacity or the neglect and it has been shown she cannot remedy the causes even with prompting and assistance of service providers.

Mother failed to consistently address her mental health issues. Several services were discontinued due to Mother's lack of participation and some services Mother failed to undertake completely. Although Mother's mental health has somewhat stabilized on occasion since the Agency became involved, she has failed to demonstrate consistency and failed to demonstrate an ability to maintain her mental health even with the involvement of the Agency and other service providers. Again, Mother has never consistently addressed her mental health and has shown she cannot and will not remedy the issue.

The children were removed from the home for over two years, during which time Mother has not demonstrated a capacity to provide parental care or perform parental duties on a consistent basis. As an example, Mother was informed of the dangers of children jumping from furniture and running with lollipops in their mouths by the first in-home Pressley Ridge team. One year later, the second in-home team still had to address this issue with Mother and prompt her to provide the proper supervision of the children. Similarly, the condition of the home was addressed by the first and second in-home team. Mother did remedy the conditions when prompted by the initial team, however, when the second team became involved, the conditions of the home had deteriorated significantly and once again Mother demonstrated that she cannot or will not address the issues.

With regard to Father, as previously stated, Father has repeatedly refused to cooperate with the Agency and participate in services. Father has not provided parental care or

43

performed parental duties and no evidence was presented to suggest that Father can or will remedy the situation.

Therefore, the Court does find that termination of Mother and Father's parental rights pursuant to Section 2511(a)(2) is appropriate based on the credible evidence presented.

### Section 2511(a)(5)

Under Section 2511(a)(5), the party moving for termination must show the following factors: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to the child's removal or placement continue to exist; (3) the parents cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parents are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child. *In re A.R.M.F.*, 837 A.2d 1231, 1234 (Pa. Super. 2003) (internal citations omitted).

C.L. has been removed from the care of Mother for over twenty-five (25) months due to Mother's unstable mental health and environmental concerns. Mother's mental health continues to be unstable and inconsistent. Mother failed to address her mental health issues during the twenty-five (25) months, a more than reasonable amount of time for which to do so, by a failure to obtain a psychological evaluation, a failure to comply with mental health treatment recommendations and a failure to participate in various therapy services.

Mother continues to test positive for THC and tested positive as recently as March of 2017. Furthermore, the environmental issues which led to the removal of the children remain

44

the same, if not worse. Mother's home is unclean and unsafe. Mother cannot demonstrate proper parenting and has not shown an ability to cope with the daily situations involved in rearing children.

Mother has repeatedly demonstrated she cannot or will not remedy the conditions which led to removal of the children. The children have been removed from the home for over twenty-five (25) months, during which time Mother did not complete her goals, did not consistently address her mental health, continued to use marijuana, and did not address the conditions of her home. Mother has recently began mental health treatment with yet another service provider, however, Mother's mental health concerns are too extensive to address within a reasonable period of time, taking in to consideration the period of time Mother has already had to address this issue.

Mother has been provided several services, all to no avail. Twice an in-home team was utilized. She received services from MH-IDD, Pressley Ridge, True North, Families United Network, Catholic Charities, TW Ponessa and PA Counseling, among others. Mother stated she did not feel she required any additional services be provided to her. Additional services are unlikely to remedy the conditions which led to placement of the children, as evidenced by the complete failure of mother to remedy any concerns when the Pressley Ridge team was put back in her home.

Finally, with regard to Mother, termination of parental rights would best serve the needs of the child. Mother cannot provide proper parenting, cannot provide a suitable environment, and cannot remedy her mental health issues. Furthermore, the child has a strong

45

bond with the Foster Mother. It is in the best interests of the child that Mother's rights be terminated.

Since paternity was established, Father has repeatedly refused to cooperate with the Agency or participate in services. Father has not provided parental care or performed parental duties and no evidence was presented to suggest that Father can or will remedy his refusal to parent. Father has not participated in drug testing and recently pled guilty to criminal felony drug charges. He has not worked with services and the child need not wait for him any longer.

C.L. has been with his current foster family approximately nineteen (19) months. Initially, C.L. was developmentally delayed in several areas including speech and social skills. C.L. continues to work on his speech under the foster family's guidance and has made vast improvements. At the time of removal, there were concerns about C.L.'s physical development, however, C.L. is currently up to date on all his medical appointments and there are no concerns at this time.

C.L. is happy with his foster parents and has bonded with the foster family. C.L. remains with his half-sister, O.L.R., and has remained in contact with J.C., his half-brother, while with the foster family. The evidence and testimony provided does suggest C.L. has a bond with his Mother, however, it does not suggest that bond is strong. Mother herself admits her bond with C.L. has dramatically changed since his removal from the home. Additional consideration as to whether termination is in C.L.'s best interest is detailed in Section 2511(b).

46

Accordingly, the Court finds that termination of Mother and Father's parental rights pursuant to Section 2511(a)(5) is appropriate and in the best interest of the child based on the credible evidence presented.

## Section 2511(a)(8)

"[T]o terminate parental rights under Section 2511(a)(8), the following factors must be demonstrated: (1) [t]he child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa.Super. 2003).

In determining whether the conditions which led to the removal or placement of the child continue to exist, "if a parent fails to cooperate or appears incapable of benefiting from the reasonable efforts supplied over a realistic period of time", the Court may find that termination is appropriate. *In re A.R.*, 837 A.2d 560, 564 (Pa.Super. 2003). Additionally, under Section 2511(b), the Court, when considering termination under Section 2511(a)(8), shall not consider any efforts made to remedy the conditions by the parent subsequent to the giving of notice of the filing of the petition.

The Agency was involved with Mother through referrals made in 2013, 2014 and 2015. In 2014, Mother voluntarily signed over guardianship of C.L. to Maternal Grandmother, thereby ending the Agency's involvement until the instant matter began in 2015. Indisputably, C.L. has been removed from the home for over twelve (12) months. C.L.

47

was removed from the home under an emergency petition filed on January 20, 2015. C.L. was adjudicated dependent on February 13, 2015. Paternity was established with Father and he has visited the child only one time. C.L. has not been returned to Mother or Father's care since removal.

The removal of C.L. from the care of Mother was primarily due to Mother's mental health and various environmental concerns. Mother's mental health continues to be unstable and inconsistent. Mother failed to adequately address her mental health issues during the twenty-five (25) months that the child was in the custody of the Agency, a more than reasonable amount of time for which to do so. Mother failed to obtain a psychological evaluation, a failed to consistently comply with mental health treatment recommendations and a failed to participate in various therapy services. Mr. Breeland from her Pressley Ridge team opined, as early as July of 2015, that the children could be at risk for harm if Mother was not taking her medications or taking care of her mental health. Despite significant involvement of services to assist Mother, she has failed to remedy the conditions that led to the removal and they continue to exist.

Mother continues to test positive for THC and tested positive as recently as March of 2017. Furthermore, although Mother secured housing, the environmental issues which led to the removal of the children remain the same, if not worse. Mother's home is unclean and unsafe. Mother cannot demonstrate proper parenting and has not shown an ability to cope with the daily situations involved in rearing children.

48

Father has repeatedly refused to cooperate with the Agency or participate in services. Father has not participated in drug testing and recently pled guilty to criminal felony drug charges. Father had no relationship with C.L. prior to the Agency's involvement and, during the more than twenty-five (25) months that has elapsed since C.L. was placed in the custody of the Agency, Father did not develop any relationship with C.L. or evidence any interest in doing so.

C.L. has been with his current foster family approximately nineteen (19) months. Initially, C.L. was developmentally delayed in several areas including speech and social skills. C.L. continues to work on his speech under the foster family's guidance and has made vast improvements. At the time of removal, there were concerns about C.L.'s physical development, however, C.L. is currently up to date on all his medical appointments and there are no concerns at this time.

C.L. is happy with his foster parents and has bonded with the foster family. C.L. remains with his half-sister, O.L.R., and has remained in contact with J.C., his half-brother, while with the foster family. The evidence and testimony provided does suggest C.L. has a bond with his Mother, however, it does not suggest that bond is strong. Mother herself admits her bond with C.L. has dramatically changed since his removal from the home. Additional consideration as to whether termination is in C.L.'s best interest is detailed in Section 2511(b).

## Section 2511(b)

Once the Court has determined that one or more of the statutory requirements under

§ 2511(a) are satisfied, the Court must then turn to a consideration of Section 2511(b) to determine whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). Pursuant to 23 Pa.C.S.A. § 2511(b):

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b)

"Intangibles such as love, comfort, security and stability are involved when inquiring about the needs and welfare of the child." *In re C.P., supra.* Neither Mother's nor Father's own feelings of love and affection for the children prevent termination of their parental rights. See *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

"The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *In re C.P., supra.* Neither expert testimony nor a formal bonding assessment is required for consideration under this subsection of the Adoption Act. See *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011). The Court can consider the testimony that was presented by caseworkers and other witnesses in making the determination whether termination would best suit the children's developmental, physical, and emotional welfare. *Id.* As recently indicated by the Superior Court, the court is

50

not required to ignore safety concerns simply because a bond exists between the child and a parent. See *In re M.M.*, 106 A.3d 114 (Pa.Super. 2014).

"A parent's basic constitutional right to the custody and rearing of...her child is converted, upon the parent's failure to fulfill...her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re Adoption of R.J.S.*, 901 A.2d 502, 507 (Pa.Super. 2006) (internal citations omitted). A child has the right to care in a permanent, healthy, safe environment. See *In re K.M.*, 53 A.2d 781, 792 (Pa.Super. 2012) (citing *In re Adoption of R.J.S.*, 901 A.2d 502, 507 (Pa.Super. 2006)). "[A] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *Id.*

With regard to love, comfort, security and stability, the Court finds that although Mother does love her children and is able to provide minimal comfort, she is not able to provide security and stability. Mother has not been able to adequately perform her parental duties, has not adequately addressed her unstable mental health, continues to use marijuana and remains in a relationship that involves domestic violence.

Evidence does suggest Mother has a bond with her children, however, the possible effect of permanently severing that bond has not been shown to be severe. Early on in the case, the children showed a stronger bond to Mother but that bond has deteriorated since their removal. Furthermore, the court cannot ignore the safety concerns, which outweigh any parent-child bond.

51

Said safety concerns include a home filled with trash, cat feces and safety hazards such as burning candles, access to prescription medication containers and a lack of proper parental supervision. Although the court cannot terminate parental rights solely on the basis of environmental factors according to Section 2511(b), it is only the case if the environmental factors are found to be beyond the control of the parent.

The environmental issues in Mother's home are not beyond her control. She frequently demonstrated the ability to correct said conditions with supervision and prompting. The problem lies in that Mother was only able to correct the conditions after being prompted to do so by a service provider. When given the chance to prove her ability and desire to provide an appropriate environment for the children without assistance from a service provider, Mother was unable to do so, even with her paramour residing with her in the home.

Additionally, when Mother received a payment of several thousand dollars from SSI disability, she was in control of her ability to establish housing. She did establish a residence, however, the residence she chose was not suitable or appropriate for children due to concerns with the ingress and egress. It took over nine (9) months for her to correct the issue with the housing she chose, and even then, she only did so with the assistance and prompting of service providers.

The first Pressley Ridge in-home team closed out in October of 2016 and by early 2017 a second referral was made for an in-home team through Pressley Ridge in response to the conditions of the home and mother's mental health as witnessed by the Agency. Not only

52

did Mother show a lack of ability to appropriately parent, her parenting skills appeared to have deteriorated.

Finally, this Court must consider Mother's mental health in addition to environmental concerns. Mother's mental health continues to be unstable and inconsistent. Mother failed to address her mental health issues during the time the children were removed from her home. She failed to obtain a psychological evaluation, failed to comply with recommendations for mental health treatment and failed to participate in various therapy services. During the twenty-five (25) months since removal, Mother was involved in some form of mental health treatment for only nine (9) of those months.

As previously noted, Father has no relationship with the child, has failed to complete his goals and has had only one visit with C.L. since his removal from the home. There has been no evidence of any parent-child bond between C.L. and Father and no evidence that Father can or will adequately provide for C.L.'s needs and welfare.

At the time of filing of the petition to terminate parental rights, C.L. was with his current foster family for a total of nineteen (19) months. The foster family reports the children are happy and well-cared for. C.L. remains with O.L.R. and keeps in contact with his other half-siblings. The termination of parental rights does best serve the developmental, physical and emotional needs and welfare of the child.

## CONCLUSIONS OF LAW

1. The Agency has not established by clear and convincing evidence that Mother has either demonstrated a settled purpose to relinquish their parental rights or has failed to perform

parental duties on behalf of the C.L. for at least six months prior to the filing of the petition. *23 Pa.C.S. § 2511(a)(1)*.

2. The Agency has established by clear and convincing evidence that Father has demonstrated a settled purpose to relinquish his parental rights and has failed to perform parental duties on behalf of C.L. for at least six months prior to the filing of the petition. *23 Pa.C.S. § 2511(a)(1)*.

3. The Agency has established by clear and convincing evidence that the incapacity, neglect and refusal of Mother and Father has caused C.L. to be without essential parental care, control or subsistence necessary for their physical or mental well-being and the conditions and causes of the incapacity, neglect and refusal cannot or will not be remedied by Mother or Father. *23 Pa.C.S. § 2511(a)(2)*.

4. The Agency has established by clear and convincing evidence that C.L. was removed from the care of Mother and Father for a period in excess of six (6) months and has since remained in placement. The circumstances which led to the child's placement continue to exist, and Mother and Father cannot or will not remedy these conditions within a reasonable period of time, and the services or assistance available to Mother and Father are not likely to remedy the conditions within a reasonable period of time. Furthermore, the termination of parental rights is in C.L.'s best interest. *23 Pa.C.S. § 2511(a)(5)*.

5. The Agency has established by clear and convincing evidence that C.L. was removed from his parents' custody more than twelve months prior to the filing of the termination petition and that the circumstances that necessitated placement continue to exist.

54

Furthermore, the termination of parental rights is in C.L.'s best interest. *Pa.C.S. § 2511(a)(8)*.

6. Termination of Mother's and Father's parental rights will best serve C.L.'s needs and welfare. *23 Pa. C.S. § 2511(a)(5); 23 Pa. C.S. § 2511(a)(8); 23 Pa. C.S. § 2511(b)*.

As the Court has found credible evidence exists to support termination of Mother's and Father's rights pursuant to both Section 2511(a) and Section 2511(b), the Court does **GRANT** the petition filed by the Agency.

Dated: 5/7/17

BY THE COURT,

_____
ANDREA MARCECA STRONG, JUDGE

55

# IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA
## ORPHANS' COURT DIVISION

IN RE:

· C. L. · : No. 2017-21

# FINAL DECREE FOR INVOLUNTARY TERMINATION OF PARENTAL RIGHTS

AND NOW, _____9th_____ day of May, 2017, after a Hearing on the Petition for Involuntary Termination of Parental Rights of **REBECCA LYNCH**, with respect to respect to

**C. L.** , the Court hereby finds such parent or parents have forfeited all parental rights; therefore, the prayer of such petition is hereby GRATNED, and all the rights of such parent or parents are hereby terminated forever, with all the effects of such decree as provided in Section 2521 of the Adoption Act, including extinguishment of the power or right to object or receive notice of adoption proceedings.

Legal and physical custody of the child, **C. L.** are continued in York County Office of Children, Youth and Families, 100 West Market Street, York, Pennsylvania.

BY THE COURT:

Andrea Marceca Strong, Judge

YORK, PA
JUDICIAL CENTER

2017 MAY -9 PM 4:25

ORPHANS
RECEIVED

Circulated 03/05/2018 01:27 PM

IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA

In Re: Adoption of            :
      **O.L.R.** ,             :     No. 2017-18
        A Minor         :     Termination of Parental Rights

APPEARANCES:

Wanda Neuhaus, Esquire           Daniel Worley, Esquire
Office of Children, Youth & Families     Guardian Ad Litem

Peter Vaughn, Esquire            John Christopher Rupert.
Counsel for Mother              Pro Se

Thomas Gregory, Esquire         **FILED**
Counsel for **O.L.R.**           Mo. 5 Day 9 Year 17

                       ORPHANS' COURT DIVISION

## ADJUDICATION

Presently before the Court is the Petition for Involuntary Termination of Parental Rights of John Rupert and Rebecca Lynch to  **O.L.R.**  filed by York County Children, Youth, and Family (hereinafter "Agency") on January 25, 2017. An evidentiary hearing was originally scheduled for, and was conducted on, March 20, 2017. At the hearing on March 20, 2017, a continued hearing was scheduled for March 28, 2017, due to insufficient time to present evidence. At the time of the hearing, the Guardian Ad Litem advocated for the children. The Supreme Court recently reminded us in *In re Adoption of L.B.M.*, 84 MAP 2016, 2017 WL 1162209 (Pa. March 28, 2017) that the child is entitled to counsel pursuant to §2313(a). Therefore, the Court appointed legal counsel for the child, afforded counsel the opportunity to meet with his client, review the record and request additional proceedings if he deemed it warranted to protect the legal interest of the child.

1

# 23

Counsel recommended the child not be returned home but instead, should remain with the foster family.

Based upon the evidence presented at the hearings, and upon consideration of the record, the Petition for Involuntary Termination of Parental Rights of Mother and Father to **O.L.R.** is GRANTED for the reasons outlined herein.

## FINDINGS OF FACT

1. The record docketed at CP-67-DP-14-2015 with the Clerk of Courts in the Court of Common Pleas in York County was incorporated into the Orphans' Court record docketed as above with no objection.

2. Rebecca Lynch (hereinafter "Mother") is the natural mother of **O.L.R.** (hereinafter "O.L.R.").

3. Mother currently resides at729 Poplar Street, 1st Floor, York PA 17402.

4. John Rupert (hereinafter "Father") is the biological father of O.LR.

5. Father currently resides at 65 South Water Street, Spring Grove PA 17362.

6. A Certification of Acknowledgment of Paternity was filed on January 25, 2017, indicating there is a claim or Acknowledgment of Paternity on file with BCSE for O.L.R. The Acknowledgment of Paternity was signed by John Christopher Rupert on September 3, 2012.

7. O.L.R. has three half-siblings, **C.L.** (hereinafter "C.L.") and **J.C.** (hereinafter "J.C."), whose hearings and reviews were conducted simultaneously with hearings that pertained to O.L.R., as well as another half-sibling, who has not been the

2

subject of any court proceedings.

8. The York County Office of Children, Youth and Families (hereinafter "Agency") filed an application for emergency protective custody on January 20, 2015. The contents of the application are incorporated herein. Allegations presented in the application included:

   a. The Agency had extensive involvement with the family due to environmental concerns and mother's mental health issues.

   b. The family was accepted for services in 2014 to assist Mother in caring for the children, obtaining appropriate and stable housing, and providing the mother with community resources and services.

   c. Services were subsequently terminated when Mother signed guardianship of the children over to Deborah McMillan (hereinafter "Maternal Grandmother").

   d. Mother was residing with Maternal Grandmother.

   e. Mother was on probation for assault.

   f. On January 9, 2015, the Agency received a referral due to Mother's hospitalization as a result of a suicide attempt on January 8, 2015. Mother indicated the suicide attempt was made because the "baby dad denies their son".

   g. Mother tested positive for marijuana at the time of her admission into the hospital. She admitted to using marijuana and marijuana laced with Heroin.

   h. Mother was diagnosed with Bi-Polar Disorder, Attention Deficit/Hyperactivity Disorder, Depression, and Borderline Personality. Mother also had a history of cutting behaviors.

3

i. Mother alleged she was the victim of domestic violence in her relationship with her then paramour.

j. Father of the child, John Rupert, allegedly lives in York County.

k. On January 13, 2015, Mother left the hospital against medical advice and refused to comply with counseling and other services.

l. Maternal Grandmother agreed to continue to care for the children and was advised Mother could not live in the home.

9. A shelter care hearing was held on January 22, 2015. The Court at that time made the following findings, *inter alia*:

a. Return of O.L.R. to Mother or Father was not in the best interest of the child.

b. O.L.R. should remain in the care of Maternal Grandmother.

10. The Agency filed a dependency petition on January 27, 2015 on behalf of each child. The contents of the petition are incorporated herein. The allegations presented in the application for emergency protective custody, as outlined previously, were reiterated in the petition, *inter alia*.

11. At an adjudicatory hearing held on February 13, 2015 the children were adjudicated dependent by the Court. The contents of the Orders are incorporated herein. The Court at that time made findings that included, but are not limited to:

a. All parties were in agreement with the children remaining in the legal and physical custody of Maternal Grandmother. Mother and Father were not resources for the child.

4

b. The children were doing well.

c. The goal for the child was placement with a fit and willing relative. A concurrent goal was return to parent.

12. The Agency filed an application for emergency protective custody on April 8, 2015. The contents of the application are incorporated herein. Allegations presented in the application included, *inter alia*:

a. The Agency received information that Maternal Grandmother allowed unsupervised contact between Mother and the children.

b. The Agency met with Maternal Grandmother and advised her she was in violation of the supervision requirement in the Family Services Plan, which required Maternal Grandmother to monitor all contact between Mother and the children. The Agency reminded Maternal Grandmother that no unsupervised contact may occur between Mother and the children.

c. The Agency was advised Maternal Grandmother again allowed Mother to have unsupervised contact with the children.

d. The Court, after being informed of the unsupervised contact, verbally directed that the children remain in the care of Maternal Grandmother provided there is no further unsupervised contact between the Mother and the children. It was further directed that should Mother have further unsupervised contact, the children would be removed immediately from the custody of Maternal Grandmother and placed in foster care.

e. On April 8, 2015 the Agency representatives met with Maternal Grandmother and informed her of the directives of the Court. Maternal Grandmother stated she could no longer continue to care for the minor children. She stated she does not have a support system. Mother comes to her house and "manipulates and harasses" her, and she feels she is not adequately providing what the children need.

f. Neither parent addressed the issues which lead to placement of the children.

g. The Agency submitted a request for an in-home team to be assigned to Mother at Mother's request.

13. A shelter care hearing was held on April 13, 2015. The Court at that time made the following findings, *inter alia*:

a. Sufficient evidence was presented to prove that continuation of the child to the home of Maternal Grandmother is not in the best interest of the child.

b. To allow the child to remain in the home would be contrary to the child's welfare and reasonable efforts were made by the Agency to prevent or eliminate the need for removal of this child from the home.

14. At a dispositional review hearing on May 6, 2015, the court found:

a. Foster Mother expressed concerns about the children being returned without having their diapers changed. In addition, O.L.R. had been showing signs of illness after visits to the point that she would vomit.

a. Early Intervention evaluated O.L.R. and some behavioral concerns were identified. Foster Mother had not noted any behavioral concerns. O.L.R. was doing well but

6

may require a speech evaluation.

b. Mother resided with Maternal Grandmother, although she previously resided on Queen Street and failed to notify the agency when she moved.

c. Mother missed her psychiatric appointments on two occasions. She had an appointment set up for June 22, 2015. Mother's mental health was unstable and she was not following through with her counseling. She missed three appointments. She stated that although she did not like counseling, she would contact her father's counselor to make an appointment.

d. Mother did not follow through with the recommendation of MH-IDD for her to participate in a group home for life skills and social skills. She was unhappy with her MH-IDD caseworker and requested a different caseworker be assigned.

e. A Pressley Ridge team had been assigned to Mother, but services had not yet begun. They tried to contact her three times with no response. Mother stated she was too busy to meet with them.

f. Mother completed her terms of probation.

g. Mother had contact with the Agency regarding visitation and did attend three visits. Mother had not attended any of the evaluations for the children since they were placed in foster care.

h. Mother had an employment interview but has not yet started work.

i. Father was not present at the hearing.

15. A Court Appointed Special Advocate (CASA) was appointed for the child on May 22,

7

2015.

16. A combined Placement Review and Dispositional Review Hearing was held on July 20, 2015. At that time the Court made findings, in consideration of all evidence presented, which include, but are not limited to:

a. O.L.R. had long tantrums and trouble self-regulating and calming down. There had been issues with her vomiting in the foster home, mostly after visitation. She received services through Early Intervention and was making great progress. Her instructor reported the vomiting ended in May. O.L.R. had a well-child check and there were no reported concerns.

b. With regard to Mother:

i. She attended O.L.R.'s well-child check.

ii. Her mental health continued to be unstable and she continued to not adequately address her mental health issues. She was seeing a psychiatrist and was missing appointments. She had begun individual outpatient counseling at Pressley Ridge and began working with an in-home team through that same agency. In addition, she received intensive case management through MH-IDD.

iii. There were seven attempts to drug test Mother. Three tests were positive, one was negative, for one she was unavailable, one she was unable to provide a specimen, and one she refused to provide a specimen. She did have a prescription for Ativan, which may have been the cause of positive

8

test results. She was instructed to take three pills per day but was not taking it as prescribed.

    iv. She received assistance from the Pressley Ridge team in applying for SSI benefits and did qualify for benefits retroactively from 2010 for her multiple mental health diagnoses, which included Disassociate Identity Disorder, Panic Disorder, panic anxiety, Mood Disorder, Bi-Polar Disorder, and Depression, among others.

    v. She resided with Maternal Grandmother but anticipated finding housing when she received payment for her SSI benefits. Mother expected to receive several thousand dollars, which she would use to establish a suitable residence for herself and the children.

    vi. She was employed briefly but was involuntarily terminated.

    vii. She attended weekly supervised visitation with the children but did miss one visit. She showed signs of being overwhelmed at the visits. During one visit mother did act against the advice of the team and her actions caused O.L.R. to vomit. The team continued to assist Mother in developing appropriate parenting skills. There were concerns regarding arguing between the parents during the visits, which was causing a disruption.

  c. Father had no compliance with the permanency plan.

17. The Agency filed a Motion for Modification of Placement on August 20, 2015 and the Court entered an Order on that same date approving placement of the child with different

9

foster family. O.L.R. remained with her siblings.

18. A 90-day Review hearing was held on October 20, 2015. The court made the following findings, *inter alia*:

    a. O.L.R. was evaluated by the Capital Area Intermediate Unit and it was determined she is age appropriate and not eligible for services.

    b. With regard to Mother:

        i. She continued to reside with Maternal Grandmother and was looking for independent housing.

        ii. She was pregnant with her fourth child.

        iii. She continued to be unemployed after briefly working at Dunkin Donuts, where she voluntarily terminated her employment due to conflict with employees and her receipt of SSI benefits.

        iv. She was receiving outpatient counseling through Pressley Ridge and had been consistent with her appointments. The Pressley Ridge in-home team worked with her on parenting skills and managing her mental health.

        v. She was seen by a psychiatrist at True North.

        vi. She had a prescription for Tegretol and Atavan, to be taken as needed, and had tested negative on drug tests for three months.

    c. With regard to Father:

        i. He did not maintain contact with the Agency. The Agency had his address but not his telephone number and had sent correspondence to him.

10

19. A Permanency Review Hearing was held on December 21, 2015, at which time the Court made the following findings, which include but are not limited to:

    a. O.L.R. was transferred to a new foster home and is doing well. O.L.R. had been referred to Early Headstart and would be contacted when an opening is available.

    b. With regard to Mother:

        i. She still resided with Maternal Grandmother but stated she would sign a lease the following day for independent housing.

        ii. Her medications were modified due to her pregnancy and she was taking Benadryl to stabilize her moods.

        iii. She attended weekly outpatient counseling sessions but had rescheduled three appointments.

        iv. She continued to test negative for drugs.

        v. She attended supervised visits twice per week for two hours at a time. The visits were going well and Mother was able to manage the children.

    c. Father had no contact with the Agency and there had been no compliance with the permanency plan.

20. As part of the Court-Ordered Services & Conditions, which were included as an appendix to the Permanency Review Order and incorporated in the Order, the parents were directed to comply with various conditions, including:

    a. Mother and Father shall maintain safe, stable and appropriate housing for the children and shall maintain stable, lawful income to support the children.

11

b. Mother shall undergo random drug testing.

c. Mother shall cooperate in obtaining a psychological evaluation within ten days of the date of the Order and follow through with any recommendations made as a result of the evaluation.

d. Mother shall attend individual counseling sessions.

e. Mother shall cooperate with the Intensive Family Services Team.

21. A Status Review Hearing was held on March 22, 2016, at which time the Court made the following findings, which were stated in the Order, *inter alia*:

a. O.L.R. continued to do well in her foster home. She was happy and comfortable there. She was developmentally on target and on a waiting list for early headstart.

b. With regard to Mother:

i. She was making moderate progress at that time.

ii. She resided in independent housing. A home assessment was completed and it was found that the home itself was appropriate for reunification. There was concern, however, in relation to the entrance to the third floor apartment, which is accomplished through something similar to a fire escape.

iii. She had been attending outpatient counseling through Pressley Ridge since September 2015.

12

iv. She was prescribed medication while under the care of True North, however, those medications were discontinued during her pregnancy and would be resumed following the birth of her child.

v. Mother attended four-hour visits twice per week with the children. Pressley Ridge reported, under the team's supervision, Mother was attuned to the children's needs during the visits, used appropriate discipline, and prepared food and snacks.

vi. Mother's paramour was awaiting a risk of harm evaluation.

c. Father had no involvement with the Agency or O.L.R.

22. A Permanency Review Hearing was held on June 6, 2016. At that time the Court made the following findings, which were stated in the Order and include but are not limited to:

a. O.L.R. was evaluated through Early Intervention and no longer needs screenings due to making progress. Foster parents were awaiting the results of the hearing to begin the Head Start evaluation.

b. With regard to Mother:

i. She had been meeting with a team from Pressley Ridge for nearly a year. There had been moderate compliance with the permanency plan. There was continued concern with Mother's mental health. She had begun taking her prescribed medications again after the birth of her child. She also had a mental health plan and had been attending therapy. In addition, she

13

identified a guardian if "she is not stable and she is hospitalized against her will."

    ii. She continued to reside in independent housing, with her paramour and their son, D. , although she was again reminded that she needed to seek proper housing as the only entrance to the residence is similar to a fire escape and this required assistance for Mother to get the children into the home.

    iii. She was living with her significant other and there were continued concerns about his threat of harm to the children relating to an aggravated assault charge.

    iv. The children visited with mother at her home under the partial supervision of the team. She had established a structure for sleeping and feedings and there was improvement with the structure of the home. The team was recommending expansion of visits, but Mother continued to have unsafe access to her home.

    v. Drug testing of Mother ended in March 2016. There were forty-eight (48) attempts made and of the forty-eight (48), eleven (11) were positive for Ativan, twenty (20) were negative and she was unavailable for fourteen (14).

c. Father had not responded to any of the Agency's attempts to contact him and had made no attempts to be in contact with O.L.R.

14

23. As part of the Court-Ordered Services & Conditions, which were included as an appendix to the Permanency Review Orders, the parents were directed to comply with various conditions, including:

   a. Both parents shall maintain safe, stable and appropriate housing for the children and shall maintain stable, lawful income to support the children.

   b. Both parents shall undergo random drug testing.

   c. Both parents shall cooperate in obtaining a psychological evaluation within ten days of the date of the Order and follow through with any recommendations made as a result of the evaluation.

   d. Both parents shall attend individual counseling sessions.

   e. Both parents shall cooperate with the Intensive Family Services Team.

24. A Status Review was held on September 6, 2016 at which time the Court found, *inter alia*:

   a. With regard to Mother:

      i. There continued to be domestic violence issues between Mother and her paramour. Her paramour was recommended to complete a batterer's intervention through SpiritTrust Lutheran, but he had not contacted the same. Mother was recommended to meet with a domestic violence group through Access York.

      ii. Her visits remained supervised.

      iii. She had four positive tests for Marijuana since August 15, 2016 to the date of the hearing on September 6, 2016. She admitted use of Marijuana and

15

reported being out of her medication. She did not request assistance to secure additional medication.

    iv. She continued to reside in the third floor apartment that had an unsafe ingress/egress. She was offered the second floor apartment, but did not move. She was promised the first floor apartment that was then being renovated. Though she was offered other housing options, she chose not to take advantage of them.

  b. Father had not maintained contact with the agency, though he did appear at the hearing. He was out on bail at that time for pending charges and acknowledged that he was not a resource for the child.

25. Mother filed a Petition to Resume Partially Unsupervised Visitation with Mother on September 9, 2016. A hearing was held before the Court on September 21, 2016, and the Court issued the following directives:

  a. Visits with Mother shall continue to be supervised, whether in Mother's home or in the community.

  b. No unsupervised contact shall be permitted unless the concerns related to domestic violence issues within the home are first addressed and her paramour is drug tested on a random basis and tests negative prior to any unsupervised contact occurring.

26. At a Permanency Review Hearing held on November 14, 2016, the Court made the following findings, *inter alia*:

16

a. O.L.R. attended Head Start four days per week. O.L.R. was up to date on all medical appointments. She was having trouble adjusting to her mother's home.

b. With regard to Mother:

    i. Mother was compliant with Pressley Ridge services. She completed the requirements for the Pressley Ridge team and they closed their service.

    ii. She was afforded unsupervised visits in the first floor apartment as the agency failed to appear to partially supervise the visit.

    iii. Mother continued to struggle to keep the home clean and safe.

    iv. She refused domestic violence treatment though she and her paramour would begin couples counseling once he completed two counseling sessions at PA Counseling.

c. Father did not maintain contact with the Agency or with O.L.R. He did not attend the hearing.

27. A Petition for Involuntary Termination of Parental Rights as to both parents was filed on January 24, 2017, alleging grounds under 23 Pa. C.S.A. § 2511 (a)(1), (2), (5), and (8).

28. A Status Review Hearing was held on February 15, 2017. The Court, at that time, made the following findings:

a. With regard to O.L.R.

    i. She attended Head Start weekly.

    ii. She attended church with the foster family weekly.

    iii. She was up to date on all her medical appointments.

17

b. With regard to Mother:

   i. Mother had weekly, semi-supervised visits in her home with the children. Reports indicated that Mother and her significant other are often yelling and arguing during visits. Mother yells and speaks harshly to the children.

   ii. She had been cooperative with drug testing since August. She tested positive for THC in January and again in the beginning of February. She tested negative on the date of the hearing for everything but benzodiazepines, for which she has a prescription for Alprazolam. She was directed to submit to a hair follicle test within forty-eight (48) hours of the hearing.

   iii. She received individual therapy to address domestic violence and anger management issues. She was unsuccessfully discharged for non-attendance. She declined treatment from True North.

   iv. She was scheduled for an intake with PA Counseling, but rescheduled the appointment.

c. Father did not attend the hearing and had not had any contact with the Agency or O.L.R.

29. At the termination of parental rights hearing held on March 20, 2017, and the continued hearing on March 28, 2017, the Court found the following evidence credible, which includes but is not limited to:

   a. As it relates to Mother:

18

i. The Agency was previously involved with Mother in May of 2013. A referral, related to O.L.R., was made for lack of supervision and physical abuse; the Agency did not open for services.

ii. On January 1, 2014, in response to a referral based on environmental concerns and Mother's mental health issues, the family was accepted for services. Catholic Charities became involved but Mother was discharged from services with them for non-cooperation. The Agency later closed services due to Mother signing over guardianship of the children to Maternal Grandmother.

iii. The Agency received another referral in November of 2014, however, services were not opened at that time.

iv. Once again, in November 2015, the Agency received a referral due to concerns relating to Mother's mental health. It was unclear at the time if the children were living with Mother. Mother was hospitalized shortly thereafter due to a suicide attempt. In response, the Agency was granted custody of the children after filing an Emergency Petition for Custody.

v. The children were adjudicated dependent and Maternal Grandmother was granted legal and physical custody of the children.

vi. While in Maternal Grandmother's custody, reports were made that the children were allowed unsupervised contact with Mother. The Agency, upon the Court's orders, addressed the unsupervised contact with Maternal

19

Grandmother and, in response; she requested the immediate removal of the children from her custody.

vii. On May 6, 2015, a dispositional review hearing was held and the children were placed in foster care. The goal at that time was reunification.

viii. A Family Service Plan (hereinafter "FSP") was established, under which Mother's goals were to cooperate with MH/IDD services, specifically DBT and individual therapy, complete a psychological and psychiatric evaluation, cooperate with random drug screens, attend medical appointments, attend visitation with the children, cooperate with Early Intervention, maintain safe and stable housing, secure stable income, and cooperate with an in home team through Pressley Ridge. In June of 2016, the Agency added the additional requirements that Mother attend a women's empowerment group or domestic violence counseling due to ongoing concerns about the domestic violence within the home. With regard to the goal of cooperating with Early Intervention, Mother did not cooperate with the initial services through Early Intervention.

ix. With regard to the goal of completing a psychological and psychiatric evaluation, Mother has not completed the goal. Mother did have an evaluation completed in 2014, prior to the establishment of the current FSP. Mother has not completed an evaluation after the FSP was put in place. Michael Breeland, a family therapist with Pressley Ridge, testified

20

there were many attempts made towards this goal, yet Mother failed to complete the goal.

x.  Mother did not cooperate with MH-IDD and, as such, she did not complete the established goal.

xi.  Mother did secure stable income through Social Security with the assistance of the Pressley Ridge team.

xii.  Mother did not complete the goal of attending a women's empowerment group or other domestic violence counseling. Mother did not engage in couples counseling. Mother's paramour did not complete batterer's intervention.

xiii.  Mother's established goal was to cooperate with drug screening. She did complete drug testing through Families United Network. From June 9, 2015 to the present date, there have been eight-five (85) attempts to test Mother. Three (3) times Mother was unable to provide a sample and twenty-one (21) times Mother was unavailable for testing. There was one (1) refusal on June 9, 2015. There were twenty-four (24) negative results and thirty-six (36) positive results. Of the positive results, twenty-eight (28) of those were only positive for the drugs for which Mother had a prescription. One (1) test, completed on August 15, 2016, was positive for THC only. The remaining seven (7) results were positive for Mother's prescription medication and THC. The positive results for THC occurred

21

in August and September of 2016 and then again in January and February of 2017. The levels of THC indicate Mother smoked marijuana at least two times, and possibly a third time, between August of 2016 and the present time. It is also worth noting that on August 23, 2016 she tested positive for THC and benzodiazepine, despite her prescription not being filled at the time.

xiv. Mother established independent housing in December 2015, eleven (11) months after the children were removed from her care. The third floor apartment, however, was not deemed appropriate due to concerns with the method of access to the apartment being similar to a fire escape. The concerns were addressed by the caseworker in court repeatedly and Mother eventually moved into the first floor apartment in September, 2016. The current apartment consists of four rooms. There is an eat-in kitchen, a room that doubles as a living room and a bedroom for Mother and Mother's paramour, and two other rooms that are available as bedrooms for children. The Agency reviewed Mother's housing in July 2015, and again in early January of 2017. Although Mother's current residence has heat and electric, as well as beds for the children, Mother still struggles with cleanliness of the home. Although the home itself is appropriate, the condition of the home is not appropriate for young children.

22

xv. With regard to the goal of attending visitation with the children, beginning in April of 2015, Mother attended weekly visits with the children. The visits were at the Agency and supervised by a case aid for one hour twice per week. In June of 2015, Pressley Ridge began supervising the visits and continued to do so through October of 2015, when the visits were moved to the Lafayette house. Additionally, at that time, the visits were increased from one to two-hour visits. In January of 2016, the visits began to occur at the home and were semi-supervised by the team until around January 13, 2016, when Mother's paramour moved into the home and the visits were moved pending completion of a threat of harm evaluation by Mother's paramour. Beginning February 2, 2016, the visits were again supervised and they remained such until June of 2016.

xvi. Mother's paramour completed a behavioral health evaluation on June 1, 2016. The Agency accepted this evaluation in lieu of the threat of harm evaluation. No further evidence or testimony was presented in regard to the behavioral health evaluation or the results. The evaluator recommended ongoing therapeutic services for Mother's paramour and ongoing mentoring and moral support for the family. He did not comply with the recommendations and did not complete therapy.

23

xvii. With regard to the goal of attending all medical appointments and following through with recommendations for mental health services, the Court found the following testimony to be credible:

1. In 2015 MH-IDD recommended Mother attend counseling through True North. Three appointments were scheduled with True North and Mother did not attend any of the appointments.

2. Between the months of June and August of 2015, Mother attended one (1) individual therapy session.

3. Between the months of September of 2015 and March of 2016, Mother attended weekly individual therapy sessions. Those sessions ended in March of 2016 due to cancellations and attendance issues.

4. From March through October of 2016, Mother did not participate in any mental health outpatient counseling.

5. On October 31, 2016, Mother re-engaged with True North for mental health treatment with therapist Samuel Means. She completed an assessment, and attended appointments scheduled on November 18, 2016 and December 7, 2016. Mother also scheduled four consecutive sessions to occur on December 14, 2016, December 21, 2016, December 28, 216, and January 17, 2017. Mother missed the last two sessions. Mother did not attend therapy

24

sessions after that date, despite the fact her counselor recommended further anger management and domestic violence counseling. Mother was discharged on January 9, 2017, due to attendance issues.

6. Mother had an appointment with PA Counseling on February 12, 2017 which she did not attend.

7. Mother had an intake with TW Ponnessa on March 2, 2017. Although she did not meet the criteria for drug and alcohol counseling, she did receive mental health counseling. She eventually attended a session on March 13, 2017, which was ten (10) days after the petition for termination of parental rights was received by Mother.

xviii. With regard to the goal of cooperating with the Pressley Ridge team, Mother did cooperate with the initial team. The referral to Pressley Ridge was made by the Agency in April of 2015. That assignment was closed successfully in October of 2016 after approximately seventeen (17) months of intensive services. Pressley Ridge was then referred by the Agency for placement of a team again in February of 2017. The Pressley Ridge service was closed on March 8, 2017, in response to a threatening Facebook message posted by Mother's paramour, which created safety concerns for Pressley Ridge employees.

25

xix. During the involvement of the first Pressley Ridge team, from April of 2015 through October of 2016, Mother interacted with the team approximately 159 times. The Court found the following information in regard to that time to be credible:

1. Heather Lentz, a family advocate with Pressley Ridge supervised visits beginning May 6, 2015 and ending on October 21, 2016. She assisted Mother with parenting skills and techniques. There were concerns related to Mother's parenting abilities, however, she was quick to address issues after the advocate brought them to her attention. Mother often yelled at the children. When the advocate addressed this issue with Mother, she denied yelling at the children.

The advocate brought concerns about the condition of the home to Mother's attention; specifically dirty dishes, toys and other detritus lying about. Again, Mother addressed the issues after the advocate pointed them out, however, Mother was not able to self-identify issues or concerns or make any effort to correct safety concerns without the assistance of the team. Similarly, there were concerns about Mother's parenting of the children, who often climbed furniture and jumped off of it. Finally, the advocate noted that Mother appeared overwhelmed at times. Mother would step

26

out of the home for a cigarette break to deal with this, leaving the representative from the team to supervise the children.

2. Michael Breeland, a family therapist with Pressley Ridge, was involved with Mother during this time period. During his involvement he did witness a dirty diaper on the floor of Mother's home as well as the children running with lollipops in their mouths. He also accompanied Mother to appointments and assisted her in addressing her goals during this time.

Mother was to address the concerns regarding the entry to her third floor apartment and Mr. Breeland assisted her in contacting the rental agency. Several weeks later, during one of Mr. Breeland's visits, he escorted Mother to the office of the rental agency, where Mother was told the agency secured a new apartment for her, however, they had been trying to reach Mother and her phone was disconnected. It took Mother more than nine (9) months to address the housing issue.

During another of Mr. Breeland's visits, he assisted Mother in setting up her attendance at a women's empowerment group, as a part of her FSP goals. Mother had to use Mr. Breeland's telephone as she did not have one. She did schedule an appointment at that

time, however, she failed to go to the appointment. She thereafter refused to attend domestic violence counseling.

A copy of the wellness action recovery plan for Mother was given to her by Mr. Breeland. She later reported she lost her copy of the plan.

xx. By 2016, Mother was managing her mental health and was maintaining the home environment to standards that, although not high, were acceptable to the Agency. However, there were concerns about Mother's ability to manage these things without the assistance and prompting of the Pressley Ridge team. As a result, the team was closed out in October of 2016 as a step towards reunification.

xxi. On February 15, 2017, another referral was made to Pressley Ridge as a result, in part, to a visit made to the home by Jessica Jones, a supervisor with the Agency. During that visit Ms. Jones found concerning, among other things, the condition of the home and Mother's parenting skills. Old food was all over a highchair and one of the children ate the food. One of the children had a pill bottle and when Ms. Jones brought it to Mother's attention, she shook the bottle, stated it was empty, and sat it back down where the child could access it again.

xxii. Carla Arp, a family engagement specialist with Pressley Ridge supervised four visits during February and March of 2017. During these visits,

28

Mother was responsible for supervising the children. The team only intervened or offered suggestions if there was a safety concern. It was noted that Mother was not receptive to suggestions.

The Court, in consideration of Ms. Arp's testimony, found the following to be credible:

1. During a visit on February 21, 2017, Mother utilized yelling and screaming as a way to parent and did not provide proper guidance to the children on interacting with the family cat or each other. For example, when one child would strike another or engage in inappropriate interactions, Mother was not able to appropriately address the situation.

   The condition of Mother's home was deplorable. There was trash scattered throughout the home, a kitty litter box in plain view and cat droppings on the floor. In the kitchen, there were large leaf collection bags filled with trash. A medicine container was within access of the children. There were unlimited amounts of food dropped throughout the home and not cleaned up, which the children would then pick up and eat.

2. The visit on February 24, 2017 occurred mostly at a park. During that time mother allowed J.C., O.L.R.'s half-brother to have seven (7) cookies, despite his need for a restricted diet. Additionally,

29

there was an incident where Mother was on the porch, talking on her telephone, while the kids were playing around a gate. J.C. ran off, and when Ms. Arp brought it to Mother's attention, she stated she was going to beat him and then leaned around the corner and yelled for him to come back.

3. On March 3, 2017 another visit took place in Mother's home. Mother's parenting skills were found to be of concern. The children were eating medicated lollipops although none of the children were ill. O.L.R. was jumping off the couch with the lollipop in her mouth. Despite the fact this issue has been addressed with Mother in the past, Mother did not address the behavior until Ms. Arp brought it to her attention. D. O.L.R.'s half-brother, had learned to walk that very day and was doing so with a lollipop in his mouth. When asked to address this. Mother stated he's fine.

Additionally, there was an occasion when Mother instructed O.L.R. to reach amongst burning candles, which were positioned along the edge of the counter, to get a candle that was not yet lit.

Mother also had inappropriate conversations with the children. Specifically, she discusses the foster parents with them and at one point told O.L.R. that her father wants nothing to do with her.

30

The condition of the home was also of great concern during this visit. Ms. Arp reports trash, clutter and food everywhere and in fact stated the condition of the home was the worst she had seen. There were no clean utensils or dishes, causing the children to have to eat their lunches out of baking pans. The mattress in the living room, which doubles as a bedroom for Mother and her paramour, was filthy.

At one point Mother had to step outside to calm herself after being served with court documents. Ms. Arp supervised the children at that time and heard the children arguing over bubble gum. When she investigated she found that one of the children had something in his mouth. Further investigation proved the child was chewing on a used urine strip from a pregnancy test.

4. Due to the conditions of the home and concerns for the safety of the children, the final visit observed by the team in March 2017 was held at the Lafayette House. The children were jumping off of the furniture and mother failed to properly address the issue. Mother also had inappropriate conversations with the children regarding the foster parents and spent much of the time on the telephone with her paramour.

31

xxiii. In the last six months, Mother has performed some parental duties for the children. During visits she would interact with the children. She would do the children's hair or cook for the children, however, she often resorted to sitting on the couch watching television with the children. During one particular visit, the family specialist noted C.L. watched television for nearly the entire duration of the visit. During other visits Mother spent her time on a video conference with her paramour, which inhibited her ability to supervise the children.

xxiv. Mother's paramour has been living with her since 2015. They anticipate getting married. He admits to using marijuana and having a problem with anger. He believes Mother's mental health is "perfect" and that the condition of the home is good. He believes Ms. Arp lied with regard to Mother being on the telephone with him during visits. He denied talking to the police the weekend prior to the hearing. Mother's paramour was not a credible witness.

xxv. Mother did testify with regard to C.L. that since he was removed from the home he has pushed himself away from her and it was as if he did not know who she was any more.

xxvi. The testimony of maternal grandfather was not relied upon by the Court as credible.

32

xxvii. The Agency does not believe that Mother is in a position to return to partially supervised visits and, as such, visits have not progressed to the point where they were unsupervised. There have been numerous concerns throughout the course of the dependency action regarding parenting, environmental issues in the home, and a lack of overall parental supervision. Mother has stated she does not feel there are any services which the Agency did not provide.

xxviii. It was reported that the weekend previous to the hearing, the police were called to the Mother's home due to an altercation between Mother and her paramour. At that time, the police also expressed concerns about the condition of the home. Mother testified that the condition of the home "had nothing to do with me" as it was her paramour who "trashed" everything.

xxix. The most concerning issue is Mother's mental health, which she has not consistently addressed. In Mother's own words, her mental health is stable "as of right now". However, she has not shown an ability to sustain stability of her mental health for any meaningful length of time since 2014.

xxx. Mother has not completed her goals. Between December of 2015 and August of 2016, Mother made only moderate progress in accomplishing her goals and only due to the intensive services provided by the team. By September of 2016, she was only able to make minimal progress in

accomplishing her goals. By the hearing on the petition to terminate her parental rights, the condition of her home had again significantly deteriorated.

xxxi. The children have been out of the home for twenty-five (25) months. There has never been an overnight visit with Mother during that time.

b. As it relates to Father:

  i. The Agency did send information to him at the contact address established with them. He did not respond, although he has always had the same address.

  ii. The caseworker went to Father's residence in an attempt to make unannounced home visits. The caseworker left letters for Father regarding the case at that time.

  iii. Copies of all documents and notices were sent to Father.

  iv. No response was made by Father.

  v. No goals were established for Father, other than to contact the Agency if he wanted to be involved in the case or receive services.

c. As it relates to O.L.R.:

  i. Foster father reported that the child has lived with the foster family since August of 2015 and is doing well in the foster home.

  ii. O.L.R. is currently attending pre-school a few days a week, and is approaching the time to begin kindergarten.

34

iii. The family attends church on Wednesday nights and again on Sunday.

iv. O.L.R. has resided with her half-brother, C.L. The foster parents have also maintained some visits between O.L.R. and a half-sibling, J.C., who was reunified with his father.

## DISCUSSION

The Agency petitioned this Court to involuntarily terminate the parental rights of Mother and Father to C.L. and O.L.R., arguing the following portions of the Adoption Act, found in Title 23 of the Pennsylvania Consolidated Statutes, are relevant:

> §2511. Ground for involuntary termination
> (a) General Rule. – The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>>
>> \*\*\*
>>
>> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance

35

reasonably available to the parent are not likely to remedy the conditions which led to removal or placement of the child within a reasonable period of time and termination of parental rights would best serve the needs and welfare of the child.

***

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with the agency. 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

(b) Other considerations. – The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b).

"Parental rights may be involuntarily terminated where any one subsection of 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa.Super. 2010). The party seeking termination of parental rights must demonstrate the validity of the asserted grounds for termination by "clear and convincing evidence." *In re R.N.J.*, 985 A.2d 273, 276 (Pa.Super. 2009) (quoting *In re S.H.*, 879 A.2d

36

802, 805 (Pa.Super. 2005)). Clear and convincing evidence is defined as evidence "so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa.Super. 2003)). It is the role of the court to "examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants the involuntary termination." *In Interest of A.P.*, 692 A.2d 240, 245 (Pa.Super. 1997).

## Section 2511(a)(1)

Termination of parental rights pursuant to Section 2511(a)(1) does not require the Agency to produce evidence of both an intent to relinquish parental claims on the child and a failure to perform parental duties. *In re C.M.S.*, 832 A.2d 457, 461 (Pa.Super. 2003) (citing *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)). With regard to what is considered parental duties, the Supreme Court of this Commonwealth has stated:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.'

37

*In the Interest of A.P.*, at 245 (citing *In re Burns*, 379 A.2d 535 (Pa. 1977)).

It is clear in the case at hand that Mother has not evidenced a settled purpose of relinquishing parental claim to O.L.R. Mother has participated in services and made attempts to accomplish the goals outlined for her by the Agency. Furthermore, out of more than one-hundred and fifty (150) scheduled visits with the children, Mother only missed two.

As to whether Mother failed to perform parental duties, there is evidence to suggest that while she did not perform some parental duties, she did adequately perform others. There is no doubt Mother loves her children. She has established a residence separate from Maternal Grandmother and income. She often cooked for the children and provided snacks. She did the children's hair, maintained a bed for each child and did demonstrate proper parenting skills when supervised and directed to do so.

Father, on the other hand, has both evidenced a purpose of relinquishing parental claim to O.L.R. and failed to perform parental duties. He has repeatedly failed to communicate with or respond to the Agency and has had no contact with O.L.R.

Therefore, the Court cannot find that termination of Mother's parental rights pursuant to Section 2511(a)(1) is appropriate based on the credible evidence presented, but does find that termination of Father's parental rights under this section is appropriate.

A detailed discussion of Section 2511(b) appears herein.

### Section 2511(a)(2)

38

Section 2511(a)(2) focuses on the child's present and future need for proper care. *In re Involuntary Termination of Parental Rights to E.A.P., a Minor.* 944 A.2d 79, 82 (Pa.Super. 2008) (hereinafter "E.A.P.") (citing 23 Pa.C.S.A. § 2511(a)(2); see *In re R.I..* 361 A.2d 294 (Pa. 1976)). Whether termination is appropriate under Section 2511(a)(2) is not limited to affirmative misconduct, rather includes the incapacity to perform parental duties as well. *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Id.* At 340. Subsection (a)(2) emphasizes the child's "need for essential parental care, control, or subsistence necessary for his physical or mental well-being." *E.A.P..* 944 A.2d at 82.

The Court in *In Interest of Lilley,* 719 A.2d 327, 330 (Pa.Super. 1998) had the following to say about what is now Section 2511(a)(2):

> The fundamental test in termination of the parents' rights was long ago cited in *In re Geiger*, 459 Pa. 636, 331 A.2d 172 (1975). There, the Pennsylvania Supreme Court announced that pursuant to IPS section 311(2) of the Adoption Act of 1970, now section 2511(a)(2) of the Adoption Act, the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *Id.* at 639, 331 A.2d at 174.

*Id.* (citing *In re Geiger*, 331 A.2d 172, 174 (Pa. 1975)).

Mother's incapacity due to her mental health conditions remains an ongoing concern since the removal of the children from the home and, furthermore, the concerns with regard to

39

the home environment have repeatedly been noted during that time. These concerns have led to the children being without proper parental care.

During visits with Mother, she repeatedly failed to properly guide the children and provide a healthy environment for the children to the point where their safety was called into question, and visits were moved out of Mother's home. Mother has never been able to remedy the causes of her incapacity or the neglect and it has been shown she cannot remedy the causes even with prompting and assistance of service providers.

Mother failed to consistently address her mental health issues. Several services were discontinued due to Mother's lack of participation and some services Mother failed to undertake completely. Although Mother's mental health has somewhat stabilized on occasion since the Agency became involved, she has failed to demonstrate consistency and failed to demonstrate an ability to maintain her mental health even with the involvement of the Agency and other service providers. Again, Mother has never consistently addressed her mental health and has shown she cannot and will not remedy the issue.

The children were removed from the home for over two years, during which time Mother has not demonstrated a capacity to provide parental care or perform parental duties on a consistent basis. As an example, Mother was informed of the dangers of children jumping from furniture and running with lollipops in their mouths by the first in-home Pressley Ridge team. One year later, the second in-home team still had to address this issue with Mother and prompt her to provide the proper supervision of the children. Similarly, the condition of the home was addressed by the first and second in-home team. Mother did remedy the conditions

40

when prompted by the initial team, however, when the second team became involved, the conditions of the home had deteriorated significantly and once again Mother demonstrated that she cannot or will not address the issues.

With regard to Father, as previously stated, Father has not communicated with the Agency during the time the children were removed from the home. Father has not provided parental care or performed parental duties and no evidence was presented to suggest that Father can or will remedy the situation.

Therefore, the Court does find that termination of Mother and Father's parental rights pursuant to Section 2511(a)(2) is appropriate based on the credible evidence presented.

## Section 2511(a)(5)

Under Section 2511(a)(5), the party moving for termination must show the following factors: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to the child's removal or placement continue to exist; (3) the parents cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parents are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child. *In re A.R.M.F.*, 837 A.2d 1231, 1234 (Pa. Super. 2003) (internal citations omitted).

O.L.R. has been removed from the care of Mother for over twenty-five (25) months due to Mother's unstable mental health and environmental concerns. Mother's mental health continues to be unstable and inconsistent. Mother failed to address her mental health issues

41

during the twenty-five (25) months, a more than reasonable amount of time for which to do so, by a failure to obtain a psychological evaluation, a failure to comply with mental health treatment recommendations and a failure to participate in various therapy services.

Mother continues to test positive for THC and tested positive as recently as March of 2017. Furthermore, the environmental issues which led to the removal of the children remain the same, if not worse. Mother's home is unclean and unsafe. Mother cannot demonstrate proper parenting and has not shown an ability to cope with the daily situations involved in rearing children.

Mother has repeatedly demonstrated she cannot or will not remedy the conditions which led to removal of the children. The children have been removed from the home for over twenty-five (25) months, during which time Mother did not complete her goals, did not consistently address her mental health, continued to use marijuana, and did not address the conditions of her home. Mother has recently began mental health treatment with yet another service provider, however, Mother's mental health concerns are too extensive to address within a reasonable period of time, taking in to consideration the period of time Mother has already had to address this issue.

Mother has been provided several services, all to no avail. Twice an in-home team was utilized. She received services from MH-IDD, Pressley Ridge, True North, Families United Network, Catholic Charities, TW Ponessa and PA Counseling, among others. Mother stated she did not feel she required any additional services be provided to her. Additional services are unlikely to remedy the conditions which led to placement of the children, as

evidenced by the complete failure of mother to remedy any concerns when the Pressley Ridge team was put back in her home.

Finally, with regard to Mother, termination of parental rights would best serve the needs of the child. Mother cannot provide proper parenting, cannot provide a suitable environment, and cannot remedy her mental health issues. Furthermore, the child has a strong bond with the Foster Mother. It is in the best interests of the child that Mother's rights be terminated.

Father has repeatedly failed to communicate with the Agency and has not responded to any of the Agency's correspondence. Father has not provided parental care or performed parental duties and no evidence was presented to suggest that Father can or will remedy his refusal to parent. He has not worked with services and the child need not wait for him any longer.

O.L.R. has been with her current foster family approximately nineteen (19) months. O.L.R. is currently up to date on all her medical appointments and there are no concerns at this time.

O.L.R. is happy with her foster parents and has bonded with the foster family. O.L.R. remains with her half-brother, C.L., and has remained in contact with J.C., her half-brother, while with the foster family. The evidence and testimony provided does suggest O.L.R. has a bond with her Mother, however, it does not suggest that bond is strong. Additional consideration as to whether termination is in O.L.R.'s best interest is detailed in Section 2511(b).

43

Accordingly, the Court finds that termination of Mother and Father's parental rights pursuant to Section 2511(a)(5) is appropriate and in the best interest of the child based on the credible evidence presented.

## Section 2511(a)(8)

"[T]o terminate parental rights under Section 2511(a)(8), the following factors must be demonstrated: (1) [t]he child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa.Super. 2003).

In determining whether the conditions which led to the removal or placement of the child continue to exist, "if a parent fails to cooperate or appears incapable of benefiting from the reasonable efforts supplied over a realistic period of time", the Court may find that termination is appropriate. *In re A.R.*, 837 A.2d 560, 564 (Pa.Super. 2003). Additionally, under Section 2511(b), the Court, when considering termination under Section 2511(a)(8), shall not consider any efforts made to remedy the conditions by the parent subsequent to the giving of notice of the filing of the petition.

The Agency was involved with Mother through referrals made in 2013, 2014 and 2015. In 2014, Mother voluntarily signed over guardianship of O.L.R. to Maternal Grandmother, thereby ending the Agency's involvement until the instant matter began in 2015. Indisputably, O.L.R. has been removed from the home for over twelve (12) months.

44

O.L.R. was removed from the home under an emergency petition filed on January 20, 2015. O.L.R. was adjudicated dependent on February 13, 2015. O.L.R. has not been returned to Mother or Father's care since removal.

The removal of O.L.R. from the care of Mother was primarily due to Mother's mental health and various environmental concerns. Mother's mental health continues to be unstable and inconsistent. Mother failed to adequately address her mental health issues during the twenty-five (25) months that the child was in the custody of the Agency, a more than reasonable amount of time for which to do so. Mother failed to obtain a psychological evaluation, a failed to consistently comply with mental health treatment recommendations and a failed to participate in various therapy services. Mr. Breeland from her Pressley Ridge team opined, as early as July of 2015, that the children could be at risk for harm if Mother was not taking her medications or taking care of her mental health. Despite significant involvement of services to assist Mother, she has failed to remedy the conditions that led to the removal and they continue to exist.

Mother continues to test positive for THC and tested positive as recently as March of 2017. Furthermore, although Mother secured housing, the environmental issues which led to the removal of the children remain the same, if not worse. Mother's home is unclean and unsafe. Mother cannot demonstrate proper parenting and has not shown an ability to cope with the daily situations involved in rearing children.

Father has repeatedly failed to communicate with the Agency and has not responded to any correspondence from the Agency. Father had no relationship with O.L.R. prior to the

45

Agency's involvement and, during the more than twenty-five (25) months that has elapsed since O.L.R. was placed in the custody of the Agency, Father did not develop any relationship with O.L.R.

O.L.R. has been with his current foster family approximately nineteen (19) months. O.L.R. is currently up to date on all her medical appointments and there are no concerns at this time.

O.L.R. is happy with her foster parents and has bonded with the foster family. O.L.R. remains with her half-brother, C.L., and has remained in contact with J.C., her half-brother, while with the foster family. The evidence and testimony provided does suggest O.L.R. has a bond with her Mother, however, it does not suggest that bond is strong. Additional consideration as to whether termination is in O.L.R.'s best interest is detailed in Section 2511(b).

### Section 2511(b)

Once the Court has determined that one or more of the statutory requirements under § 2511(a) are satisfied, the Court must then turn to a consideration of Section 2511(b) to determine whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). Pursuant to 23 Pa.C.S.A. § 2511(b):

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the

-46-

> court shall not consider any efforts by the parent to remedy
> the conditions described therein which are first initiated
> subsequent to the giving of notice of the filing of the
> petition.

23 Pa.C.S.A. § 2511(b)

"Intangibles such as love, comfort, security and stability are involved when inquiring about the needs and welfare of the child." *In re C.P., supra.* Neither Mother's nor Father's own feelings of love and affection for the children prevent termination of their parental rights. See *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

"The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *In re C.P., supra.* Neither expert testimony nor a formal bonding assessment is required for consideration under this subsection of the Adoption Act. See *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011). The Court can consider the testimony that was presented by caseworkers and other witnesses in making the determination whether termination would best suit the children's developmental, physical, and emotional welfare. *Id.* As recently indicated by the Superior Court, the court is not required to ignore safety concerns simply because a bond exists between the child and a parent. See *In re M.M.*, 106 A.3d 114 (Pa.Super. 2014).

"A parent's basic constitutional right to the custody and rearing of...her child is converted, upon the parent's failure to fulfill...her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re Adoption of R.J.S.*, 901 A.2d 502, 507 (Pa.Super. 2006) (internal citations omitted). A child has the right to care in a permanent, healthy, safe environment. See *In re*

47

*K.M.*, 53 A.2d 781, 792 (Pa.Super. 2012) (citing *In re Adoption of R.J.S.*, 901 A.2d 502, 507 (Pa.Super. 2006)). "[A] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *Id.*

With regard to love, comfort, security and stability, the Court finds that although Mother does love her children and is able to provide minimal comfort, she is not able to provide security and stability. Mother has not been able to adequately perform her parental duties, has not adequately addressed her unstable mental health, continues to use marijuana and remains in a relationship that involves domestic violence.

Evidence does suggest Mother has a bond with her children, however, the possible effect of permanently severing that bond has not been shown to be severe. Early on in the case, the children showed a stronger bond to Mother but that bond has deteriorated since their removal. When interviewed by her legal counsel, O.L.R. made a gesture pointing to her current location in the foster home when asked where she wanted to live. Furthermore, the court cannot ignore the safety concerns, which outweigh any parent-child bond.

Said safety concerns include a home filled with trash, cat feces and safety hazards such as burning candles, access to prescription medication containers and a lack of proper parental supervision. Although the court cannot terminate parental rights solely on the basis of environmental factors according to Section 2511(b), it is only the case if the environmental factors are found to be beyond the control of the parent.

The environmental issues in Mother's home are not beyond her control. She frequently demonstrated the ability to correct said conditions with supervision and prompting.

48

The problem lies in that Mother was only able to correct the conditions after being prompted to do so by a service provider. When given the chance to prove her ability and desire to provide an appropriate environment for the children without assistance from a service provider, Mother was unable to do so, even with her paramour residing with her in the home.

Additionally, when Mother received a payment of several thousand dollars from SSI disability, she was in control of her ability to establish housing. She did establish a residence, however, the residence she chose was not suitable or appropriate for children due to concerns with the ingress and egress. It took over nine (9) months for her to correct the issue with the housing she chose, and even then, she only did so with the assistance and prompting of service providers.

The first Pressley Ridge in-home team closed out in October of 2016 and by early 2017 a second referral was made for an in-home team through Pressley Ridge in response to the conditions of the home and mother's mental health as witnessed by the Agency. Not only did Mother show a lack of ability to appropriately parent, her parenting skills appeared to have deteriorated.

Finally, this Court must consider Mother's mental health in addition to environmental concerns. Mother's mental health continues to be unstable and inconsistent. Mother failed to address her mental health issues during the time the children were removed from her home. She failed to obtain a psychological evaluation, failed to comply with recommendations for mental health treatment and failed to participate in various therapy services. During the twenty-five (25) months since removal, Mother was involved in some form of mental health

treatment for only nine (9) of those months, and on a sporadic basis, at best. The court finds that the child would be at risk of harm if unsupervised contact with Mother were permitted.

As previously noted, Father has no relationship with the child and has failed to communicate with the Agency or the child. There has been no evidence of any parent-child bond between O.L.R. and Father and no evidence that Father can or will adequately provide for O.L.R.'s needs and welfare.

At the time of filing of the petition to terminate parental rights, O.L.R. was with her current foster family for a total of nineteen (19) months. The foster family reports the children are happy and well-cared for. O.L.R. remains with C.L. and keeps in contact with her other half-siblings. The termination of parental rights does best serve the developmental, physical and emotional needs and welfare of the child.

## CONCLUSIONS OF LAW

1. The Agency has not established by clear and convincing evidence that Mother has either demonstrated a settled purpose to relinquish their parental rights or has failed to perform parental duties on behalf of the O.L.R. for at least six months prior to the filing of the petition. *23 Pa.C.S. § 2511(a)(1)*.

2. The Agency has established by clear and convincing evidence that Father has demonstrated a settled purpose to relinquish his parental rights and has failed to perform parental duties on behalf of O.L.R. for at least six months prior to the filing of the petition. *23 Pa.C.S. § 2511(a)(1)*.

50

3. The Agency has established by clear and convincing evidence that the incapacity, neglect and refusal of Mother and Father has caused O.L.R. to be without essential parental care, control or subsistence necessary for her physical or mental well-being and the conditions and causes of the incapacity, neglect and refusal cannot or will not be remedied by Mother or Father. *23 Pa.C.S. § 2511(a)(2)*.

4. The Agency has established by clear and convincing evidence that O.L.R. was removed from the care of Mother and Father for a period in excess of six (6) months and has since remained in placement. The circumstances which led to the child's placement continue to exist, and Mother and Father cannot or will not remedy these conditions within a reasonable period of time, and the services or assistance available to Mother and Father are not likely to remedy the conditions within a reasonable period of time. Furthermore, the termination of parental rights is in O.L.R.'s best interest. *23 Pa.C.S. § 2511(a)(5)*.

5. The Agency has established by clear and convincing evidence that O.L.R. was removed from her parents' custody more than twelve months prior to the filing of the termination petition and that the circumstances that necessitated placement continue to exist. Furthermore, the termination of parental rights is in O.L.R.'s best interest. *Pa.C.S. § 2511(a)(8)*.

6. Termination of Mother's and Father's parental rights will best serve O.L.R.'s needs and welfare. *23 Pa. C.S. § 2511(a)(5); 23 Pa. C.S. § 2511(a)(8); 23 Pa. C.S. § 2511(b)*.

51

As the Court has found credible evidence exists to support termination of Mother's and Father's rights pursuant to both Section 2511(a) and Section 2511(b), the Court does GRANT the petition filed by the Agency.

Dated: 5/9/17

BY THE COURT,

ANDREA MARCECA STRONG, JUDGE

52

IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

IN RE:
    O.L.R.                          :               No. 2017-18

## FINAL DECREE FOR INVOLUNTARY TERMINATION OF PARENTAL RIGHTS

AND NOW, _____ day of May, 2017, after a Hearing on the Petition for Involuntary Termination of Parental Rights of REBECCA LYNCH, with respect to respect to O.L.R. , the Court hereby finds such parent or parents have forfeited all parental rights; therefore, the prayer of such petition is hereby GRATNED, and all the rights of such parent or parents are hereby terminated forever, with all the effects of such decree as provided in Section 2521 of the Adoption Act, including extinguishment of the power or right to object or receive notice of adoption proceedings.

Legal and physical custody of the child,   O.L.R.   are continued in York County Office of Children, Youth and Families, 100 West Market Street, York, Pennsylvania.

BY THE COURT:

Andrea Marceca Strong, Judge

YORK, PA
JUDICIAL CENTER

2017 MAY -9 PM 4:25

#31